**Bertha L. PATE, Plaintiff–Appellant,**

v.

**SERVICE MERCHANDISE CO., INC., Michael Thomas, Manager, Lisa Duncan, Velma Wilson, Defendants–Appellees.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Sept. 26, 1996.

Application for Permission to Appeal Denied by Supreme Court March 17, 1997.

George E. Skouteris, Sr., John W. Leach, Memphis, for Plaintiff–Appellant.

Gail 0. Mathes, Memphis, for Defendants–Appellees.

CRAWFORD, Presiding Judge, Western Section.

This is a defamation case. Plaintiff, Brenda L. Pate, appeals from the order of the trial court granting summary judgment to defendants, Service Merchandise, Co., Inc., Michael Thomas, Lisa Duncan, and Velma Wilson. The sole issue is whether the trial court erred in granting the defendants' motion for summary judgment.

## I.

The plaintiff filed this action after she was terminated from her position as a nurse manager by St. Francis Hospital. The plaintiff was fired after she was suspected of stealing a co-employee's (Laverne Lutton's) credit card and using the credit card to purchase two video cassette recorders (VCRs) from Service Merchandise.

Lutton's credit card was stolen on January 2, 1991 while she was working at the hospital. Lutton discovered later that day that her credit card had been stolen, and she reported the incident to the security department at St. Francis Hospital. The chief safety officer at St. Francis, Richard A. Hunt, reported the theft to Union Planters National Bank. Lutton filed a report of the incident with the Memphis Police Department.

On January 11, 1991, Lutton received her credit card statement from Union Planters and discovered a charge at Service Merchandise which she did not make. She asked Rita Schroeder, the President of St. Francis Hospital, to accompany her to Service Merchandise in an attempt to discover what had been charged to the card and to determine the identity of the thief. When Lutton and Schroeder arrived at Service Merchandise, they were informed by store management that the items charged to the card could not

be determined without the credit card receipt, but with the help of Michael Thomas, the assistant manager of Service Merchandise, Lutton eventually discovered that two VCRs were purchased using her credit card.

Lutton suspected the plaintiff of the theft based upon a conversation in which she told the plaintiff about the theft, and the plaintiff did not express concern or surprise. Lutton further believed that the plaintiff was the thief because she felt like God was telling her that the plaintiff was responsible for the theft.

Based upon her suspicions of the plaintiff, Lutton obtained photographs of the plaintiff from Robert Halford, the Director of Human Resources at St. Francis Hospital, and, along with Schroeder, returned to Service Merchandise. Upon arriving, Michael Thomas escorted Lutton and Schroeder to Lisa Duncan and Velma Wilson, the two clerks who were present when the VCRs were purchased. Thomas had previously been informed that Lutton and Schroeder were at the store regarding a fraudulent credit card purchase. Without reporting the incident to the unit manager or the district loss prevention manager, Thomas decided to cooperate with the investigation. However, the Service Merchandise policy manual states, "All known or suspected credit card fraud is reported to the appropriate District Loss Prevention Manager by the Unit Manager." In addition, it is standard Service Merchandise policy not to talk with the general public regarding credit card fraud, but only to talk with the local police.

Lutton presented the defendant clerks, Velma Wilson and Lisa Duncan, with a photographic line-up consisting of four pictures. Three of the photographs were pictures of white females, and one of the pictures was of a black female. Lutton first showed the four photographs to Wilson, whereupon she picked up the picture of the plaintiff, took it to the other clerk, Lisa Duncan, and asked her if she remembered the person in the photograph (the plaintiff). Duncan then proceeded to the counter to view the other three pictures of the white females. Both clerks identified the plaintiff as the individual who purchased the VCRs on January 2, 1991, but

admitted that the person in the photograph had a different hairstyle. The alleged defamation by each clerk is the oral statement identifying the plaintiff.

Upon returning to the hospital, Lutton and Schroeder informed the St. Francis Hospital security department about the identification of the plaintiff, and the security department commenced its own investigation. Lt. Richard A. Hunt and Sgt. Herbert David McKee were placed in charge of the investigation and constructed their own photo line-up. While the photo spread contained pictures of five black women, the photograph of the plaintiff was a blown-up version of the picture that Lutton used and was much larger than the other four.

In full uniform, Hunt and McKee took their photo line-up to Service Merchandise to conduct a second identification procedure. Once again, Thomas authorized McKee and Hunt to present their photo line-up to the clerks, Wilson and Duncan. After viewing the photographic line-up, the clerks noted that the plaintiff's photograph was outstanding and different from the other pictures in the spread. The clerks identified the blown-up version of plaintiff's picture and then executed a written statement identifying the plaintiff as the person who purchased the two VCRs with Lutton's credit card. The alleged defamatory written statement by Velma Wilson is "I Velma Wilson pick out picture #3 who I sold 2 VCR to her and a black man." The alleged defamatory statement by Lisa Duncan is "I, Lisa R. Duncan, do remember seeing the person on photo number 3 in Service Merchandise. I was not the actual person who rang up the transaction, but I remember the customer." ·

Following the second identification, the plaintiff was advised by Halford, who was acting for St. Francis, that she would be cleared of any wrongdoing if she could prove her whereabouts on January 2, 1991, between the hours of 2:00 and 3:00 p.m. (the time during which the credit card was stolen from the hospital). On March 14, 1991, St. Francis suspended the plaintiff because she was unable to prove her whereabouts on the relevant date and time other than by her own statements. On March 18, 1991, St. Francis officially terminated the plaintiff as an employee.

Plaintiff's amended complaint [1] alleges that defendant Service Merchandise and its employees, defendants Thomas, Wilson, and Duncan, were negligent in making the identification of plaintiff, Bertha Pate. The complaint further avers that Service Merchandise negligently violated its own policy by allowing its employees to talk to personnel of St. Francis Hospital's security in conducting its investigation concerning the stolen property. The complaint avers that these defendants maliciously or negligently identified plaintiff as the person who purchased the VCRs on a stolen credit card. Defendants' answer joins issue on the material allegations of the complaint and denies that there was any negligent or malicious identification and denies that there were any slanderous or libelous statements made concerning plaintiff. The answer avers that the defendants acted in good faith and that their communications were made in a privileged context by cooperating in an investigation of possible credit card theft.

The trial court granted summary judgment for all defendants stating that there was no statement, oral or written, that constituted defamation of the plaintiff, either libel or slander, as a matter of law; and that there was no act of commission or omission which constituted negligence as a matter of law.

## II.

A trial court should grant a motion for summary judgment only if the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn.R.Civ.P. 56.03; *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn.1993); *Dunn v. Hackett,* 833 S.W.2d 78, 80 (Tenn.App.1992). The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd,* 847

---

1. The complaint also names as defendants St. Francis Hospital, Laverne Lutton and various other officers and employees of St. Francis Hospital. A consent order of dismissal was entered as to these defendants, and the action against them is not involved in this appeal.

S.W.2d at 210. When a motion for summary judgment is made, the court must consider the motion in the same manner as a motion for directed verdict made at the close of the plaintiff's proof; that is, "the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Id.* at 210–11. In *Byrd*, the Tennessee Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. [citations omitted]. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211. (emphasis in original).

The summary judgment process should only be used as a means of concluding a case when there are no genuine issues of material fact, and the case can be resolved on the legal issues alone. *Id.* at 210 (citing *Bellamy v. Federal Express Corp.*, 749 S.W.2d 31, 33 (Tenn.1988)). Summary judgment is not to be used as a substitute for a trial of genuine and material factual issues. *Byrd,* 847 S.W.2d at 210 (citing *Blocker v. Regional Medical Ctr.*, 722 S.W.2d 660, 660–61 (Tenn. 1987)). Where a genuine dispute exists as to any material fact or as to the conclusions to be drawn from those facts, a court must deny a motion for summary judgment. *Byrd,* 847 S.W.2d at 211 (citing *Dunn,* 833 S.W.2d at 80).

### III.

In *Press, Inc. v. Verran,* 569 S.W.2d 435 (Tenn.1978), our Supreme Court adopted the *Restatement (Second) of Torts* (1977) standards for liability in a defamation suit. The Supreme Court said:

We are impressed with Standards 580A [2] and 580B, Restatement (Second) of Torts (1977). They read as follows:

* * *

> § 580B. *Defamation of Private Person.* One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
>
> (a) knows that the statement is false and that it defames the other,
>
> (b) acts in reckless disregard of these matters, or
>
> (c) acts negligently in failing to ascertain them.

We believe that these standards meet the criteria of our federal and state constitutions and we adopt them as the law of this jurisdiction.

*Press, Inc.,* 569 S.W.2d at 442.

The plaintiff must establish that a false and defamatory statement was published concerning the plaintiff. *Stones River Motors, Inc. v. Mid–South Publishing Company, Inc.,* 651 S.W.2d 713, 717 (Tenn.App. 1983). The defendants contend that there are no defamatory statements because the defendants' statements are only defamatory in light of extrinsic facts.[3]

Traditionally, defamations were classified as either actionable *per se* or *per quod.* Any libel which was defamatory on its face, *i.e.,* the danger of injury to reputation was apparent from the mere words themselves, has been held to be actionable *per se.* Words which were defamatory only in the light of certain extrinsic facts were said to be libelous *per quod. Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412, 418–19 (Tenn.1978). Historically, the plaintiff had to plead and prove special damages when the defamation was libel *per quod. Id.* at 418. However in *Nichols,* the Tennessee Supreme Court held that, because presumed damages were no

---

2. Restatement (Second) of Torts § 580A (1977) deals with the defamation of a public person. There is no dispute in this case that the plaintiff is a private figure.

3. There is no dispute in this case that the statements were concerning the plaintiff or that the plaintiff suffered damages.

longer permissible[4], the *per se/per quod* distinction was no longer viable, and that the plaintiff had to plead and prove injury from the alleged defamatory words, whether their defamatory meaning was obvious or not. *Id.* at 419.

■ The Supreme Court in *Nichols* was concerned with presumed damages and strict liability, not defamation in light of extrinsic facts. The Court did not hold that words which were defamatory only in the light of certain extrinsic facts were no longer actionable; instead they held that damages must be shown in all defamation cases. Although the classification of libel *per quod* has been eliminated in Tennessee, extrinsic facts may still be used to show the defamatory meaning of words that are not defamatory on their face.

■ However, in such cases the words are said to require an innuendo—that is, a statement of circumstances which give to the words a signification and meaning which they do not have on their face, but which cannot enlarge, extend, or change the sense of the words. *Fry v. McCord Bros.*, 95 Tenn. 678, 685, 33 S.W. 568, 570 (1895). The extrinsic facts cannot be stretched to give the words a defamatory meaning that is not implied by the words. The literal truth or non-defamatory nature (without extrinsic facts) of the actual words used is not a defense. *Nichols*, 569 S.W.2d at 420. Words which are substantially true can nevertheless convey a false meaning whether intended by the speaker or not. The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener. *Id.* at 419–20; *Tompkins v. Wisener*, 33 Tenn. 458, 463; *Restatement (Second) of Torts* § 563 (1977). The determination of whether a published report is capable of a defamatory meaning is a question of law for the court. *Nichols*, 569 S.W.2d at 419.

■ Applying *Nichols* to the case *sub judice,* we conclude that the defendants' statements are capable of a defamatory meaning.

When presented with the photo line-up, Duncan and Wilson, the defendant clerks, both orally identified the plaintiff as the woman who was in the store on January 2, 1991 and who purchased two VCRs using a credit card. Later, when the security guards approached the defendants with a second photo line-up, each clerk executed a written statement identifying the plaintiff as the woman who participated in the VCR transaction. While these identifications are not defamatory on their face, it is possible for the oral and written statements to reasonably convey a defamatory meaning. The circumstances surrounding the investigation of the credit card theft give the identifications a significance that is not apparent by the actual words themselves. The inference that the plaintiff was involved in the VCR transaction and, therefore, the theft, is not one that enlarges or expands the scope of the words. It is the meaning directly implied by the words and understood by the recipients, Lutton and the security guards. The identification of a person in a photo line-up obviously imputes them with the crime being investigated, regardless of whether the speaker means to or not. The non-defamatory nature of the words themselves is not a defense because they convey a false meaning that was capable of being understood by Lutton and the security guards in a defamatory sense.

■ However, defamation is not a strict liability tort. To prevail in a defamation cause of action, the plaintiff must also show some level of fault on the part of the defendant. *Nichols*, 569 S.W.2d at 418. The Tennessee Supreme Court decided that negligence is the standard in a defamation suit involving a private plaintiff. *Id.* In *Nichols*, the Supreme Court said,

> In determining the issue of liability, the conduct of the defendant is to be measured against what a reasonably prudent person would, or would not, have done under the same or similar circumstances.... In our opinion, the appropriate question to be determined from a preponderance of the evi-

---

**4.** The United States Supreme Court held that presumed damages and strict liability in defamation cases were unconstitutional. *Gertz v. Robert*

*Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

dence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it.

*Id.* Finally, the Restatement imposes liability only if the defendant acts negligently in failing to ascertain truth or falsity. *Press, Inc.,* 569 S.W.2d at 442; *Restatement (Second) of Torts* § 580B (1977).

We note that all of the cases cited concern media defendants. However, in *Trigg v. Lakeway Publishers, Inc.,* 720 S.W.2d 69, 75 (Tenn.App.1986), the Middle Section of this Court specifically held that a non-media co-defendant was entitled to the same First Amendment protection as a media defendant.

Plaintiff claims that the defendants were negligent because they did not take advantage of surveillance cameras to verify their identifications. However, the record establishes that no surveillance cameras were in place in either the electronics department (where the transaction took place) or the customer pick-up area (where the purchaser receives the goods purchased) on the date of the alleged transaction. The store manager, Michael Thomas, stated in his affidavit that there were no surveillance cameras in the electronics department and in his deposition that there were no surveillance cameras in the customer pick-up area. The defendants did not have any way to verify the truth of their identifications except through personal observation and memory.

█ The plaintiff further contends that the clerks were negligent because they entertained doubts about the identification. Duncan admitted that the person in the photograph had a different hair style than the plaintiff. However, the record states that Duncan was sure that it was the same person because she had a long time to look at the woman during the transaction. The record is devoid of any proof that the clerks doubted their identification. Negligence is not established by the fact that a different hairstyle appeared in the picture. Many people wear their hair in different styles on different days but are still recognizable.

The plaintiff also argues that the clerks could have cleared up any doubts by sending the credit card receipt to a handwriting expert to determine if the plaintiff was the one involved in the VCR transaction. While this may be literally true, we believe that it is unreasonable and absurd to expect a layperson who is asked to identify someone in a picture to suggest a handwriting expert before pointing to a picture of someone they reasonably believe that they recognize.

Finally, the plaintiff argues that Service Merchandise and its clerks were negligent because they did not follow internal Service Merchandise policies and procedures regarding fraudulent credit card transactions. The plaintiff alleges that at the time in question it was the standard policy of Service Merchandise that its employees were prohibited to talk with the general public regarding credit card fraud and could only discuss credit card fraud with the police. This argument fails because a violation of corporate policy by the clerks has nothing to do with ascertaining truth or falsity. Even if they violated policy by speaking with Lutton and the security guards, the clerks may have been careful and reasonable in what they told them.

We believe that the defendants exercised reasonable care and caution in checking on the truth or falsity of their statements, and therefore, an essential element of defamation fails. A reasonable and prudent person would rely on their own observations and memory to identify someone in a photo line-up. We hold that the trial court was correct in granting summary judgment because no statement, either written or oral, constituted defamation because there was no fault on the part of any defendant.

## IV.

Even if the statements by the defendants constituted defamation, we believe that the defendants are entitled to summary judgment because those statements are conditionally privileged under a public interest privilege.

█ A conditional privilege is recognized where the interest which the defendant is seeking to vindicate or further is regarded as

sufficiently important to justify some latitude for making mistakes. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 115, at 825 (5th ed.1988). The Tennessee Supreme Court authorized conditional privileges in *Southern Ice Co. v. Black,* 136 Tenn. 391, 189 S.W. 861 (1916):

> Qualified privilege extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation.... The rule announced is necessary in order that full and unrestricted communication concerning a matter in which the parties have an interest may be had. It is grounded in public policy as well as reason.

*Id.* at 401, 189 S.W. 861 (citations omitted); *see also Price v. Sale,* 8 Tenn.C.C.A. 382, 392–3 (1918).

Conditional privileges may cover many different types of interests including a common interest and a public interest. Keeton et al., *supra,* at 826–31. The common interest privilege has been recognized in Tennessee to cover communications between employees or agents of the same business or corporation. *See Woods v. Helmi,* 758 S.W.2d 219 (Tenn. App.1988); *Southern Ice Co.,* 136 Tenn. 391, 189 S.W. 861. We do not decide if the parties involved in the case *sub judice* have a common interest because we believe that the defendants' statements are covered by a public interest privilege.

The public interest privilege was discussed by the Tennessee Court of Appeals in *Travis v. Bacherig,* 7 Tenn.App. 638 (1928):

> The defense of privileged communication must be made in good faith in the prosecution of an inquiry regarding a crime which has been committed, and for the purpose of detecting and bringing to punishment the criminal. "The law requires such charges to be made in the honest desire to promote the ends of justice, and not with spite or malicious feeling against the person accused, nor with the purpose of obtaining any indirect advantage to the accuser. Nor should serious accusations be made recklessly or wantonly; they should always be warranted by some circumstances reasonably arousing suspicion, and they should not be made unnecessarily to persons unconcerned, nor before more persons, nor in stronger language than necessary."

*Id.* at 643 (citations omitted).

The interests of the public in preventing crime and punishing criminals outweigh the interest of any plaintiff concerning statements of accusation, as long as the accusation is made in good faith and without express malice. The Restatement (Second) of Torts (1977) states the important public interest privilege as follows:

> § 598. *Communication to One Who May Act in the Public Interest*
>
> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> (a) there is information that affects a sufficiently important public interest, and
>
> (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

*Restatement (Second) of Torts* § 598 (1977).

■ Our Supreme Court has adopted sections 580A and 580B of the Restatement as the law on defamation in Tennessee. *Press, Inc.,* 569 S.W.2d at 442. Section 598 is cross-referenced in section 580B. We are not aware of any Tennessee case that has considered the public interest privilege as it applies to communications with private citizens; however, we believe the Restatement is a correct statement of the law in this regard and should be applied in this state.

There is no doubt that the investigation of a crime and the apprehension of criminals are important public interests. In the case *sub judice,* even though the investigation was not conducted by the local police, the investigation by the security department could have led to the apprehension of the criminal. It is reasonable for anyone in the

position of the clerks to believe that the identification would affect the public interest of preventing crime. The public interest privilege is grounded in public policy, and we should encourage cooperation with an investigation of a criminal matter.

■ The statements made in the course of the cooperation cannot include irrelevant defamatory matter not related to the public interest and cannot be made in the presence of a third person who does not have a legitimate interest in the matter. Keeton et al., *supra*, at 832. The statements in this case were direct and to the point and were not overheard by any third parties. The plaintiff contends, however, that the recipients of the statements, Lutton and the security guards, were not the type of citizens contemplated by § 598. We must respectfully disagree. The comment to § 598 states, "The privilege ... affords protection to a private citizen who publishes defamatory matter to a third person even though he is not a law enforcement officer, under circumstances which, if true, would give the recipient a privilege to act for the purpose of preventing a crime or of apprehending a criminal...." *Restatement (Second) of Torts* § 598 cmt. f (1977).

We believe that Lutton and the security guards are within the purview of § 598. It was reasonable for the clerks to rely on the uniformed security guards and to help Lutton, the victim of a crime[5]. The victim of a crime has the unfortunate privilege of acting to apprehend a criminal. Most times it would be impossible for the police to successfully investigate and apprehend criminals without the actions of the victim. Likewise, the police depend on the separate investigations and services of independent security forces to aid in their own investigations. A uniformed security guard may act to apprehend a criminal or arrest a subject and detain him until the police arrive. The initial investigations by security forces are many times the springboards for successful convictions.

■ Even if the recipient is not a proper candidate to hear the defamatory statements, we believe the cornerstone of the public interest privilege should be good faith. As stated in *Travis*, 7 Tenn.App. at 643, "the defense of privileged communication must be made in good faith ... in the honest desire to promote the ends of justice." If the speaker of the defamatory statement makes the identification or accusation in good faith, the statement is covered by the public interest privilege even if the speaker makes a mistake about the recipient. Prosser and Keeton state that "while a misguided notion as to the defendant's moral obligation or justification to make the statement will not exonerate him, he is privileged to publish it to any person who reasonably appears to have a duty, interest or authority in connection with the matter." Keeton et al., *supra*, at 833.

The clerks made their identifications in good faith in an honest attempt to help in the investigation. While the record indicates that Lutton may not have been acting in good faith, it is the good faith of the speaker, not the recipient, that is the key to the public interest privilege. The uniformed security guards reasonably appeared to the clerks to have a duty and the authority to conduct the investigation. Lutton also appeared to have an interest that the clerks could vindicate by making a good faith identification.

■ The privilege can be lost, however, if the defendant does not act with good faith or acts with actual malice. When a statement is conditionally privileged, it is not actionable unless actual or express malice is shown by the plaintiff. *Woods v. Helmi*, 758 S.W.2d 219, 224 (Tenn.App.1988); *Southern Ice Co.*, 136 Tenn. at 401, 189 S.W. 861. Once privileged, the statement is presumed to have been made without malice, and the burden is on the plaintiff to prove express malice. *Langford v. Vanderbilt University*, 44 Tenn.App. 694, 318 S.W.2d 568, 576 (1958). To prove actual malice, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, and

---

5. The plaintiff claims that Lutton was not the victim because the security guards were investigating credit card fraud. However, it is clear that Lutton was the victim of a theft, which was the real thrust of the investigation by the St. Francis security department.

that publishing, with such doubt, shows reckless disregard for truth or falsity and demonstrates actual malice. *Moore v. Bailey,* 628 S.W.2d 431, 433–4 (Tenn.App.1981).

The record does not show any actual malice on the part of the defendants. As we stated above, the record does not even show any negligence, much less any malice or reckless disregard for the truth. There is no evidence that the defendants entertained serious doubts or acted with actual malice. We hold that the statements by the defendants identifying the plaintiff, both orally and written, are conditionally privileged under a public interest privilege and, therefore, are not actionable.

## V.

The plaintiff also claims that the defendants were negligent regardless of any defamatory statement. However, the trial court granted summary judgment for the defendants partly on the basis that there was no act of commission or omission which constituted negligence as a matter of law. The record does not establish any negligence on the part of the defendants. For the reasons stated above, we believe that the trial court was correct in granting summary judgment because there was no negligent act. Our holding today pretermits the issue of whether the actions of St. Francis Hospital and St. Francis employees were superseding, intervening acts.

Accordingly, the order of the trial court granting summary judgment to defendants, Service Merchandise, Co., Inc., Michael Thomas, Lisa Duncan, and Velma Wilson is affirmed. Costs of this appeal are assessed against the appellant.

FARMER and LILLARD, JJ., concur.