IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 21, 2003 Session

**SUSAN JOHNSON WHITEHURST, M.D., A/K/A DR. SUSAN JOHNSON,
AND WILLIAM WHITEHURST, JR.**
**v.**
**MARTIN MEDICAL CENTER, P.C., SUSAN LOWRY, M.D., ANNA
HOPLA, M.D., WAL-MART STORES, INC., CHRISTY THOMPSON,
CASEY VERNON, JOYCE HAYES, JOHN DOES A, B, AND C,
AND JANE DOES A, B, AND C**

**An Appeal from the Circuit Court for Weakley County**
**No. 3399      William B. Acree, Judge**

———————————————

**No. W2001-03034-COA-R3-CV - Filed August 28, 2003**

———————————————

This is a defamation case. The plaintiff is an obstetrician/gynecologist who practices in a largely rural area. The individual defendants are pharmacists who work at Wal-Mart stores in that area. In October 1997, one of the pharmacists received a phone call from her sister, another physician in the area. The sister told the pharmacist that the plaintiff obstetrician/gynecologist had contracted the HIV virus and was sending letters to her patients to inform them of that fact. The pharmacist, a former patient of the plaintiff, repeated the information to her co-workers. Several Wal-Mart employees, including the defendants, repeated the information about the plaintiff to others. The information was false. When the plaintiff learned of the spread of the false rumors, she sued the defendants for defamation. After a lengthy trial, the jury found in favor of the defendants. The plaintiff now appeals, asserting, *inter alia,* that the trial court erred in admitting evidence that was irrelevant or otherwise improper, and in approving the jury verdict. We affirm, finding that the trial court did not err in the admission of evidence, and that material evidence supports the jury's verdict.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

J. Houston Gordon, Covington, Tennessee, for the appellant, Susan Johnson Whitehurst, M.D., a/k/a Dr. Susan Johnson.

W. O. Luckett, Jr., and Lorrie K. Ridder, Memphis, Tennessee, for the appellees, Wal-Mart Stores, Inc., Christy Thompson, Casey Vernon, and Joyce Hayes.

**OPINION**

This case is a testament to the destructive power of the spoken word. Plaintiff/Appellant Susan Johnson Whitehurst, a/k/a Susan Johnson, M.D. ("Dr. Johnson"), has practiced obstetrics and gynecology in the Martin, Weakley County, Tennessee area since 1979. When she moved to Martin, 1979, she was married to co-plaintiff, William Whitehurst ("Whitehurst").[1]

Defendant/Appellee Wal-Mart Stores, Inc. ("Wal-Mart"), operates retail stores and pharmacies in Martin and in Huntingdon, Tennessee. Defendants/Appellees Christy Thompson ("Thompson"), Casey Vernon ("Vernon"), and Joyce Hayes ("Hayes") (collectively, "defendants"), at all pertinent times were licensed registered pharmacists at either the Martin or Huntingdon Wal-Mart stores.

In July 1991, Dr. Johnson filed for divorce from Whitehurst. They were separated in approximately July 1991 and reconciled in April 1993. Around that time period, between July 1991 and April 1993, a rumor circulated that Dr. Johnson and the doctors with whom she practiced had AIDS or were HIV positive, and that Dr. Johnson was sending a letter to her patients to inform them of that fact. There was some indication that either Whitehurst or Dr. Johnson's daughter started the rumor during the couple's separation. After 1993, the rumor was not prevalent, but occasionally resurfaced in the community until the events in question.

On October 6, 1997, Greg Eason, M.D. ("Dr. Eason"), a physician at Martin Medical Center, P.C. ("Martin Medical"), was approached by an unnamed individual who asked whether he had heard that Dr. Johnson was HIV positive. When Dr. Eason arrived at work, at Martin Medical, he asked his co-workers, Susan Lowry, M.D. ("Dr. Lowry") and Anna Hopla, M.D. ("Dr. Hopla"), whether they had heard that Dr. Johnson was HIV positive. Drs. Hopla and Lowry indicated to Dr. Eason that they had heard something to that effect. After that discussion, Dr. Lowry called Defendant/Appellee Thompson, who was her sister, while Thompson was at work as a pharmacist at the Martin Wal-Mart.

When Dr. Lowry called her sister, Thompson was four months pregnant with her third child. Dr. Johnson had delivered Thompson's first two children, but Dr. Lowry served as Thompson's physician on the third pregnancy. In the beginning of the conversation, Dr. Lowry asked Thompson "if [she] was sitting down," and told her that she had received information from Drs. Eason and Hopla that Dr. Johnson had tested HIV positive and was sending letters to her patients to tell them about it. Thompson became visibly upset, and began crying. Tina Davis, the pharmacy manager, attempted to console Thompson and asked her why she was upset. Thompson told Davis that she was upset because Dr. Johnson had tested HIV positive and that letters were going out to inform her patients about it. Defendant/Appellee Vernon, also a pharmacist, and Brenda Jones and Tracy Dilday, pharmacy technicians, also heard what Thompson said. Thompson then immediately left work.

---

[1]Dr. Johnson uses her maiden name in her medical profession.

Vernon later spoke with Defendant/Appellee Hayes, a pharmacist at the Huntingdon store. Vernon told Hayes what Dr. Lowry had told Thompson. Vernon also told the over-the-counter manager at Wal-Mart, Melba Allman, who in turn told her husband and her brother. In addition, Vernon was overheard by another pharmacist, Rea Hopper, when he was clarifying the information to Dr. Gossins, who had been told by a pharmacy tech. One witness later said that "rumors of this nature spread like wildfire," and that this particular rumor spread to different parts of the county.

On October 10, 1997, one of Dr. Johnson's patients, Delana Rich, went to the Huntingdon pharmacy, where Hayes was working, to pick up a prescription written by Dr. Johnson. Hayes knew that Dr. Johnson was Rich's doctor, so Hayes asked Rich if she had received a letter from Dr. Johnson's office regarding Dr. Johnson's HIV status. When Rich replied that she had not, Hayes told her to call Dr. Johnson's office to inquire about it. Rich told her friend, Tammy Taylor, who called Dr. Johnson's office and discovered that the information was untrue. Thirty to forty minutes later, Dr. Johnson's office called Hayes to tell her that the information was not true. Hayes told the Huntingdon pharmacy personnel what she had learned, and instructed them not to repeat the HIV rumor about Dr. Johnson to anyone. Hayes then called Vernon at the Martin pharmacy to tell him that the information about Dr. Johnson was not true. Within a matter of hours, everyone who worked at the Martin pharmacy was contacted, both at home and an work, and was told not to repeat the information regarding Dr. Johnson. They were also instructed to tell anyone to whom they had repeated the rumor that it was not true.

On January 14, 1998, Dr. Johnson and her husband, Whitehurst (collectively, "plaintiffs"), filed the instant lawsuit against Thompson, Vernon, Hayes, as well Wal-Mart Stores, Inc.[2] The lawsuit alleged that the defendants defamed the plaintiffs by publishing malicious and false information about Dr. Johnson. Because of the defendants' wrongful acts, the complaint alleged, Dr. Johnson suffered damage to her reputation, to her medical practice, and to her emotional well-being. Whitehurst asserted that, as Dr. Johnson's spouse, the rumors about her caused him to suffer mental and emotional damage, as well as damage to his reputation.

Prior to trial, the plaintiffs filed a motion *in limine* to exclude evidence of the prior false rumors that circulated about Dr. Johnson's alleged HIV status in the 1991-1993 time period. The plaintiffs also filed a motion *in limine* for a ruling that, as a matter of law, the defendants were not entitled to assert qualified privilege as a defense with respect the statements they repeated, and that any evidence of the defendants' "good faith" was therefore irrelevant and should be excluded at trial. The trial court denied the pre-trial motion regarding the rumors that circulated between 1991 and 1993 and allowed related evidence regarding them to be admitted at trial. The trial court reserved its ruling on the issue of qualified privilege until the end of trial.

---

[2]The plaintiffs also sued Dr. Lowry, Dr. Hopla, and their employer, Martin Medical. Prior to trial, however, the trial court granted summary judgment to Martin Medical. Also, two days after the trial began, the plaintiffs settled out of court with Dr. Lowry and voluntarily dismissed their case against Dr. Hopla, with prejudice.

On August 6, 2001, the case proceeded to trial. Over the course of the trial, the parties submitted the testimony of over forty witnesses. Much of that testimony was devoted to explaining the circumstances surrounding the circulation of the HIV rumor about Dr. Johnson, as described above. Many of the witnesses testified that they were told the false information about Dr. Johnson from a source that was traceable back to one of the defendants, Thompson, Vernon, or Hayes. Some of those witnesses, in turn, reported telling their family and friends what they had heard about Dr. Johnson.

All of the defendants maintained at trial that they sincerely believed that the information they had heard about Dr. Johnson was true. All said that they believed that Dr. Lowry and her co-worker physicians at Martin Medical were a reliable source for such information. They submitted evidence that pharmacists routinely rely on information supplied by physicians, and that they had no reason to doubt the information Thompson was given by her sister, Dr. Lowry. Hayes asserted that she felt she had a duty to give the information to Rich, a patient of Dr. Johnson, and asserted that the other employees in the pharmacy needed to know the information as well.

Dr. Johnson testified at trial about the effect of the HIV rumors on her personally and in her practice. She said that the effect of the rumors was devastating. She submitted evidence that she became clinically depressed, and that her ability to perform as a physician was adversely affected by the slander. She lost her self confidence and became unable to perform several types of major surgery, such as hysterectomies, which in the past she had performed without hesitation. After the slanderous statements, Dr. Johnson had repeated anxiety attacks in her office. She began to rely on assistance from her co-worker, Elizabeth Lund, M.D. ("Dr. Lund"), on routine procedures. Eventually, Dr. Lund had to perform all of Dr. Johnson's surgeries, because Dr. Johnson often shook and cried before surgery.

After the proof was submitted, but before closing arguments, the trial court ruled that the defendants were not entitled to assert a defense of qualified privilege. The trial court said that it would omit a qualified privilege instruction from the final instructions given to the jury. Whitehurst voluntarily dismissed his claim before the matter went to the jury for decision.

On August 15, 2001, the jury returned a verdict in favor of the defendants. On September 5, 2001, the trial court entered a judgment consistent with the verdict. Dr. Johnson timely moved for a new trial, which the trial court denied. Dr. Johnson now appeals.

Dr. Johnson argues three issues on appeal. She asserts first that trial court erred in reserving until after the proof its ruling on Dr. Johnson's pre-trial motion to exclude evidence relating to a defense of "qualified privilege." Had the ruling on the pre-trial motion not been reserved until after the proof was in, Dr. Johnson contends, the defendants would not have been permitted to place before the jury irrelevant and prejudicial evidence regarding their alleged good faith belief that the information was true and that they had a duty to repeat it to interested parties. Next, Dr. Johnson asserts that the trial court erred in permitting the defendants to present evidence relating to the rumors circulated during the 1991-1993 time period, because this evidence was irrelevant and served

only to confuse, mislead, taint, and prejudice the jury. Finally, Dr. Johnson argues that the trial court erred in declining to set aside the jury verdict, and maintains that the jury's verdict defied logic and reason and was clearly against the weight of the evidence.

The trial court has a great deal of latitude with respect to the admission of evidence and control of the order of proof. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). Therefore, with respect to the trial court's decisions to admit evidence regarding qualified privilege (i.e., "good faith") and the prior rumors, they are reversed on appeal only if they constitute an abuse of discretion. *Id.* Likewise, the trial court's decision to reserve its ruling on this issue until after the proof is reviewed under an abuse of discretion standard. As to the trial court's decision to approve the jury verdict, we must determine whether the record contains material evidence to support the verdict. *Id.* at 718. "Appellate courts do not reweigh the evidence and consider where the preponderance lies. Instead, they determine whether there is any material evidence to support the verdict, and, if there is, they must affirm the judgment." *Id.*

In order to establish a prima facie case of defamation, a plaintiff must show that "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). In this case, each of the defendants admitted to repeating the statement that Dr. Johnson had contracted the HIV virus and was writing letters to her patients to inform them of that fact. It is also undisputed that this information is false and would be defamatory to Dr. Johnson. In order to establish her case, however, Dr. Johnson was required to also show that the defendants knew the information was false, or that they made the statements with reckless disregard for the truth or with negligence in failing to ascertain the veracity of the statements. *See id.*; *see also Livingston v. Hayes*, No. E2000-01619-COA-R3-CV, 2001 WL 823626, at *6 (Tenn. Ct. App. July 23, 2001) (quoting *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978)). In other words, in order to establish her claim, Dr. Johnson was required to establish some degree of fault on the part of the defendants. *Pate v. Service Merchandise Co.*, 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996) ("[D]efamation is not a strict liability tort. To prevail in a defamation cause of action, the plaintiff must also show some level of fault on the part of the defendant.").

A defendant in a defamation case is entitled to assert a defense of "qualified privilege" if the allegedly defamatory statements were "made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty." *Southern Ice Co. v. Black*, 189 S.W. 861, 863 (Tenn. 1916). Moreover, "the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation." *Id.* When a statement is qualifiedly privileged, it is not actionable unless the plaintiff can show that it was made with actual or express malice. *Woods v. Helmi,* 758 S.W.2d 219, 224 (Tenn. Ct. App. 1988); *Parks v. Nelson*, No. E2000-02943-COA-R3-CV, 2002 WL 523458, at *5 (Tenn. Ct. App. Apr. 9, 2002). Actual malice can be shown by submitting evidence "that the defendant in fact entertained serious doubts as to the truth of his publication, and that publishing, with such doubt, shows reckless disregard for truth or falsity and

demonstrates actual malice." **Parks**, 2002 WL 523458, at *5 (quoting **Pate**, 959 S.W.2d at 577-78). Therefore, if the statements at issue were qualifiedly privileged, then Dr. Johnson would have had the burden to establish actual malice on the part of the defendants, that is, that they in fact entertained serious doubts as to the truth of the statement that Dr. Johnson had contracted the HIV virus.

Dr. Johnson argues on appeal that the trial erred in reserving its ruling on Dr. Johnson's pretrial motion for a determination that the defendants could not assert the defense of qualified privilege, and in refusing to exclude evidence of the defendants' good faith belief that the information about Dr. Johnson was true and that they had a duty to impart the information to interested parties.[3] Dr. Johnson contends that, absent a defense of qualified privilege, evidence of

---

[3]Examples of the objectionable evidence include the following portions of Thompson's testimony:

Gordon: Well, tell me how – how it came from being what was being told by somebody who was told by somebody who was told by somebody who was told by somebody, to this is the fact? How did that happen?

Thompson: We believed it to be true.

Gordon: Who's "we?"

Thompson: I did. Dr. Lowry did.

Gordon: You believed it could be true?

Thompson: Yes, it could be true.

Gordon: But you didn't know, did you?

Thompson: No, sir.

Gordon: Did you know that it just could be true when you communicated it to the other pharmacists?

Thompson: I believed it to be true at the time.

\* \* \*

Luckett: Miss Thompson, was the fact that you were told something, did that make it less truthful or not true?

Thompson: I believed it to be true.

Thompson's Testimony at 529-30. Similarly, Vernon testified:

Gordon: I believe you asked Miss [Tina] Davis, [w]ell, what if this is not true?

Vernon: No. I believed it to be true.

(continued...)

-6-

good faith is irrelevant and prejudicial. Because this evidence was admitted, she maintains, the verdict should be set aside.[4]

The defendants, on the other hand, contend that the trial court's delay in ruling on the issue of qualified privilege was not unduly prejudicial to Dr. Johnson, because the evidence on that issue was relevant for other permissible purposes. The defendants assert that the evidence was relevant to show what degree of fault, if any, was attributable to these defendants. They note that, as part of her prima facie case, Dr. Johnson was required to prove that the defendants published the false statement either with reckless disregard for the truth of the statement or with negligence in failing to ascertain the veracity of the statement. *See Sullivan*, 995 S.W.2d at 571; *Pate*, 959 S.W.2d at

---

[3](...continued)

Gordon: I want to make sure that – did you – are you absolutely certain you didn't ask Miss Davis, [w]ell, what if this is not true.

Vernon: No. I believed it to be true until that next Friday.

Vernon's Testimony at 486-87. Hayes also stated her belief in the veracity of the statements and her duty to pass the information to Dr. Johnson's patients:

Gordon: But . . . you, as a pharmacist can talk about it to anybody you want to? Is that what you're telling this jury?

Hayes: The patient I talked to [Rich] was Dr. Johnson's patient, and I gave her information that was important to her, that was pertaining to her.

\* \* \*

Gordon: Did you pick up the phone and call to find out – to get a copy of that letter to make sure that what you were saying was correct?

Hayes: No, because I believe what was told me was the truth.

Gordon: Did you request from the Martin Specialty Clinic confirmation at all?

Hayes: No, because I believed what was told to me was the truth. There were letters being sent out to that effect.

\* \* \*

Gordon: Did the people within the pharmacy have a right and a need to know this information within your pharmacy? That is Miss Hutchison and Mr. Edwards?

Hayes: Yes.

Hayes' Testimony at 201, 209-210, 228.

[4]Dr. Johnson suggests that, upon retrial, the trial court should hold a bifurcated trial or hold a hearing outside the presence of the jury in order to determine whether a qualified privilege exists so that the jury would not be exposed to the irrelevant, prejudicial evidence on the topic.

574. In order to consider the issue of fault, the defendants maintain, the jury was entitled to hear evidence regarding whether the defendants knew the statement was false, why they relied on the source of the statement, and the defendants' state of mind and the circumstances surrounding their publication of the information. The defendants point out that much of the objectionable testimony was elicited during examination of the witnesses by the *plaintiffs'* counsel. The defendants note that the issue of the ethical duty of pharmacists generally was introduced into evidence by plaintiffs' counsel.[5] Thus, the defendants argue, Dr. Johnson cannot now complain because the witnesses were questioned about the ethical duties of pharmacists.

Dr. Johnson insists that, in the absence of a defense of qualified privilege, "the presence of malice is irrelevant" and consequently that issues of "good faith" and "honest belief" are also irrelevant. We cannot agree. The fact that Dr. Johnson was not required to prove malice does not mean that the basis for the defendants' belief was irrelevant. Indeed, whether the defendant in fact believed the information to be true and the reason why the defendant relied on the source of the information is highly pertinent to the defendants' fault, an element which Dr. Johnson had the burden to prove. *See Livingston*, 2001 WL 823626, at *6; *Sullivan*, 994 S.W.2d at 571; *Pate*, 959 S.W.2d at 574. As noted in *Pate*, "[d]efamation is not a strict liability tort." 959 S.W.2d at 574.

Under these circumstances, we cannot conclude that the admission of this evidence was reversible error. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Tenn. R. Evid. 401. In this case, the evidence to which Dr. Johnson objects was probative to explain the defendants' theory of the case, tending to show that the defendants acted as a reasonably prudent person would have under the same or similar circumstances. *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978). Testimony about the circumstances surrounding the publication of the false information, such as the reason the defendants published the information and the reason they relied on the information from the physicians, was admissible to put the defendants' conduct in context, and the admission of that evidence does not constitute reversible error.

Dr. Johnson next argues that the trial court erred in admitting evidence regarding the prior rumors that circulated during the 1991-1993 time period, contending that this evidence was irrelevant and immaterial, and because the evidence was misleading and confusing, and any

---

[5]Dr. Johnson's counsel asked Hayes:

> Gordon: I want you to point me to any pharmacy ethic rule, any rule, Wal-Mart's rules, I've got Wal-Mart's Rules here . . . ."

Similarly, he asked Tina Davis:

> Gordon: Do you agree that a pharmacist[']s ethical responsibilities applies to patients and non-patients concerning confidentiality?

probative value it had was outweighed by its prejudicial effect. *See* Tenn. R. Evid. 401, 402, & 403. Dr. Johnson argues that the existence of such prior rumors was of no legal consequence, because the republishing of a defamatory statement is still defamation. She argues that the existence of the prior rumors did not make it any more or less probable that the defendants negligently published the false information.[6] Therefore, admitting that evidence only served to confuse the issues and mislead the jury. The defendants, however, assert that evidence of the prior rumors was relevant for several reasons. First, they claim that the evidence was relevant because some of the evidence showed that Dr. Johnson's spouse, plaintiff Whitehurst, may have started the earlier rumor, and the plaintiffs cannot recover if they initiated the rumor into the community. *See Langford v. Vanderbilt Univ.*, 318 S.W.2d 568, 576 (Tenn. Ct. App. 1958). They also argue that the prior rumors, believed to have been initiated by Whitehurst, were admissible as admissions of a party opponent. Finally, they contend that the prior rumors were admissible on the issue of damages.

As noted above, the trial court has a wide degree of latitude in determining whether evidence is relevant and, if so, whether such evidence should, nevertheless, be excluded based on the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992); Tenn. R. Evid. 403. Such a decision is reversed on appeal only if it constitutes an abuse of discretion. *Overstreet*, 4 S.W.3d at 702. In this case, the defendants asserted at trial that the prior rumors were initiated by Whitehurst, a plaintiff, and that the 1997 publication was actually an extension of the same, ongoing rumor. The defendants claimed that, "[b]ut for the initiation of the rumor in 1991-92 by Whitehurst, there would not be a lawsuit today." Disallowing evidence of the prior rumor would have been tantamount to preventing the defendants from proving that the plaintiff, Whitehurst, was responsible for Dr. Johnson's damages.

In addition, the defendants took the position that the circulation of the information about Dr. Johnson that emanated from defendant Thompson was very contained. They noted that Thompson repeated the information for the first time on a Monday, and by the Friday of the same week all of the employees of Wal-Mart who had heard the rumor of Dr. Johnson's purported HIV status had been told that it was untrue. Furthermore, the employees were instructed to tell anyone who knew about the rumor that it was not true. Evidence of the prior rumors circulated in 1991-1993 served to explain, from the defendants' standpoint, the reason why so many people came to hear the rumor. The defendants argued that, if the information had spread elsewhere in the community, it resulted from the prior rumors, not the defendants' conduct.

We find that evidence of the prior rumors was relevant to the issues presented in the defendants' theory of defense.[7] Therefore, since evidence of the prior rumor was relevant to establish some of the defendants' theories, we cannot find that the trial court abused its discretion

---

[6] Because the trial court allowed the evidence at trial, Dr. Johnson submitted evidence to show that, in contrast to the 1997 publications by the defendants, the earlier rumors did not have an adverse effect on her personally or professionally.

[7] It is undisputed that the prior rumor existed, as Dr. Johnson herself testified to that fact. Therefore, the reliability of that evidence was not called into question, only its relevancy.

in determining that evidence of the prior rumor was of sufficient probative value to outweigh any prejudicial effect or confusion that may have been caused by its admission.

Finally, Dr. Johnson argues on appeal that the trial court erred in declining to set aside the jury verdict and order a new trial, because the verdict defies logic and reason and was clearly against the overwhelming weight of the evidence. She notes that many of the pertinent aspects of the case were undisputed – the defendants admitted repeating the statements about Dr. Johnson's purported HIV status, they admitted that the information was false when they published it, and they admitted that they did not attempt to ascertain from other sources whether the information was true. While the evidence on Dr. Johnson's claimed economic damages was sharply disputed, Dr. Johnson notes that the evidence on Dr. Johnson's depression and emotional injury was unrefuted. Under these circumstances, she maintains, no reasonable finder of fact could have concluded that Dr. Johnson had suffered *no* damage. Therefore, Dr. Johnson argues, this Court should set aside the jury verdict and order a new trial, either in total or only on the issue of damages.

Without question, many of the pertinent facts in this case were undisputed at trial. Not *all* of the salient facts, however, were undisputed. The primary factual issue for the jury was whether the defendants were negligent, i.e., whether they acted reasonably in failing to ascertain the truth of the information before publishing it. *See Memphis Publ'g. Co.*, 569 S.W.2d at 418. Dr. Johnson asserts that liability was virtually admitted by the defendants, because they each testified that they relied solely on the representation of Dr. Lowry and her associates in assuming the accuracy of the information and took no steps to verify the information before repeating it. The crux of the defendants' position, however, is that they were entitled to rely on the information given to them, because the physicians who passed the information to them were considered to be reliable sources.[8] The defendants submitted evidence that pharmacists routinely rely on information given to them by physicians in their daily practice, and they had no reason to second-guess the information given to them by Dr. Lowry. In support, the defendants cite cases in which it has been noted that, when a source of information is reliable, it is not necessary for the defendant to have verified the information by an extrinsic source in order to avoid liability. *See Evans v. Amcash Mtg. Co.*, No. 01A01-9608-CV-00386, 1997 WL 431187, at *4 (Tenn. Ct. App. 1997) (finding that it was reasonable for corporate counsel to rely on the statements of an employee regarding her allegations of sexual harassment against the plaintiff, another employee, without further investigating the matter); *see also Livingston*, 2001 WL 823626, at *6 (finding that the defendant sheriff was not negligent in relying on information in an affidavit in making the statements about the plaintiff); *Pate*, 959 S.W.2d at 575 (holding that it was reasonable for the defendants to rely on their own observations and memory in identifying someone in a photo line up).

Dr. Johnson, in essence, asks this Court to rule, as a matter of law, that the defendants did not act reasonably in having confidence that the information conveyed by Dr. Lowry was accurate

---

[8]Indeed, Dr. Johnson argued that she not injured by the rumors circulated in 1991-1993 precisely because they were not propogated by medical professionals, since medical professionals, such as physicians and pharmacists, were ostensibly reliable sources.

and in relying on that information. That we cannot do. Determining whether the defendant acted as a reasonably prudent man would have is within the province of the jury. From our review of the record, we must conclude that there was material evidence to support the jury verdict. Consequently, the trial court's decision to uphold the jury verdict in favor of the defendants must be affirmed. This holding pretermits all other issues raised in this appeal.

The decision of the trial court is affirmed. Costs are to be taxed to the appellant, Susan Johnson Whitehurst, M.D., a/k/a Dr. Susan Johnson, and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE