**James L. WAGNER, M.D.**

v.

**Robert FLEMING, Jr., et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Aug. 22, 2003 Session.

Jan. 6, 2004.

Permission to Appeal Denied by Supreme Court June 21, 2004.

Douglas M. Cox, Chattanooga, for the appellants, Robert Fleming, Jr. and Charles Schenck.

William G. Colvin and Everett L. Hixson, Jr., Chattanooga, for the appellee, James L. Wagner, M.D.

**OPINION**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

James L. Wagner, M.D. ("the plaintiff") scheduled a public auction to sell his Bledsoe County property. The plaintiff rejected the high bids received at the auction, believing them to be too low. He then sued Robert Fleming, Jr. and Charles Schenck ("the defendants"), alleging that their activities depressed the bids at the auction. He sued the defendants under the Tennessee Consumer Protection Act, Tenn.Code Ann. § 47–18–101, *et seq.* ("the Act"), and under the common law tort theories of injurious falsehood and defamation. The jury returned a verdict in favor of the plaintiff, awarding him $20,000 in damages. The trial court also awarded attorney's fees to the plaintiff under the Act. We reverse, dismiss the original complaint, and remand for further proceedings on the defendants' request for damages pursuant to Tenn.Code Ann. § 47–18–109(e)(2).

**I.**

The plaintiff is a licensed medical doctor who is retired from the practice of his profession. He testified that he made his living by buying, developing, and selling real estate. In April, 1996, less than two years before the subject auction, the plaintiff purchased the Pope Road property for $81,000. The tract contains approximately 81 acres located on Pope Road in Bledsoe County. The plaintiff testified that he spent about $21,000 to improve his property. The improvements included, among other things, building a road and clearing the land. The plaintiff testified that he had hoped to sell the Pope Road property for $160,000.

Sometime after the plaintiff purchased the Pope Road property, Armstrong Energy Resources ("the company") announced its plans to build an energy storage plant ("the Armstrong Project") on the Laurel Branch of the Sequatchie River in Bledsoe County. The company was granted the power of eminent domain in order to facilitate its construction plans. The plaintiff was not aware of the company's plans when he purchased the Pope Road property; however, he soon learned that part of the Pope Road property might be condemned by the company. After learning of the Armstrong Project, the plaintiff

tried unsuccessfully to sell the Pope Road property. Concerned that the plaintiff would subdivide the property, defendant Fleming considered purchasing the Pope Road property; however, there was no sale because defendant Fleming could not afford the property.

Save Our Sequatchie Valley ("SOS"), a so-called grass-roots organization, was opposed to the Armstrong Project, claiming that it would injure the environment and decrease property values in the area. SOS engaged in various activities to prevent the Armstrong Project from coming to fruition in its community. The Armstrong Project was eventually delayed. According to a May 29, 1997, newspaper article admitted as evidence at the trial below, the project was delayed so the company could determine the effect of deregulation on the power industry. In the article, a company spokesperson denied that SOS's activities had impacted its decision to delay the Armstrong Project; however, a spokesperson for SOS claimed that "property owners helped prevent another multibillion-dollar error in energy production in the Tennessee Valley."

The defendants were very much opposed to the Armstrong Project. Despite the May, 1997, article, the defendants apparently feared that the company planned to revive the Armstrong Project. Defendant Fleming is a member of SOS and owns and resides on property near the Pope Road property. Although defendant Schenck is not a member of SOS, he had attended SOS meetings. Defendant Schenck owns property adjacent to the plaintiff's property; however, he uses the property for nonresidential purposes, including camping and target practice. More than 10 acres of defendant Schenck's property were potentially subject to eminent domain proceedings by the company.

After trying unsuccessfully to sell the Pope Road property and after the Armstrong Project was delayed, the plaintiff eventually decided to sell the Pope Road property by way of a public auction. Instead of selling the 81 acres as one tract, he decided to subdivide the land and auction off the various tracts. He hired Cindy Garner of Hartland Realty and Auction to organize and conduct the auction. Before the auction, Ms. Garner undertook "[q]uite a bit" of marketing activities. For example, Ms. Garner testified that she advertised in at least five area newspapers, posted a sign at the property, and distributed flyers. Defendant Fleming apparently saw one of the advertisements and called the plaintiff about the Pope Road property. The plaintiff refused to sell to defendant Fleming, saying that he would see the defendant at the auction. Defendant Schenck also approached the plaintiff before the auction about purchasing the property; however, the plaintiff testified that defendant Schenck only wanted to buy the property if it was "real cheap." Both men were interested in buying the land because they were unhappy about the plaintiff's plans to divide his acreage into tracts.

Over a week before the auction, the plaintiff testified that he saw a sign on defendant Fleming's property that said "Armstrong wants my land" and "Don't let Armstrong take my land." On November 8, 1997, the day of the auction, the defendants posted additional signs along Pope Road. Defendant Fleming testified that he paid to have the signs printed. The signs, which were one foot by one-and-a-half foot in size, contained language printed mostly in all capital letters as follows: "ARMSTRONG WANTS MY LAND"; "DON'T LET ARMSTRONG TAKE OUR LANDS"; "ENTERING ARMSTRONG Land—Theft Area 'By Imminent [sic] Domain'"; "LAND PAST HERE MAY BE

SUBJECT TO EMINENT DOMAIN"; and "PROPOSED PUMP STORAGE BOUNDARY LINE." It is undisputed that none of the signs mentioned or referred to the plaintiff or to his property specifically. Defendant Fleming testified that he and defendant Schenck chose to post the signs on the day of the auction because "[i]t was a great opportunity for exposure." Defendant Fleming explained that few, if any, people used Pope Road, and the increased traffic on the day of the auction would allow them to reach a greater number of people.

About an hour-and-a-half before the auction began, defendant Schenck testified that he fired a gun into a milk jug on his property. David Perry, a friend of the defendants who attended the auction, testified that he was present, along with defendant Schenck's girlfriend, during the gunfire. According to Mr. Perry, defendant Schenck had acquired a new gun and fired it that day in order to show Mr. Perry "what it will do." Mr. Perry also testified that the sound of gunfire was common in the area because a hunting preserve was located on Pope Road. None of the witnesses at trial testified that gunfire occurred during the auction, and the plaintiff did not know whether anyone at the auction was frightened by the noise.

The weather on the day of the auction was overcast and cold. As a result, a fire was built to provide warmth for bidders. A tent was set up with coffee and food, and the plaintiff testified that available on site was a copy of the article stating that the Armstrong Project was on hold. Ms. Garner also personally informed at least one bidder that the Armstrong Project was on hold. According to the plaintiff's testimony, about 18 to 25 people attended the auction, including the defendants. While defendant Schenck was at the auction, he did not bid. Defendant Fleming, however, registered as a bidder. Barney Neergard, who had experience conducting auctions, was in attendance and testified that he did not see the defendants attempting to "disrupt" the auction.

Mr. Perry made a $1,000 per acre bid on one tract of land. Defendant Fleming made an $800 per acre bid on other tracts of land and was a high bidder on at least one tract. Despite these and other bids, the plaintiff rejected all bids as too low. The plaintiff and Ms. Garner claimed that the defendants' actions "chilled" the auction. Ms. Garner testified that the weather could have had an effect; however, she testified that she believed the signs posted along Pope Road and the gunfire heard before the auction started affected the success of the auction. Less than five months after the auction, the plaintiff sold the property for $125,000.

After the "failed" auction, the plaintiff sued the defendants under the common law tort theory of injurious falsehood and under the Act.[1] The plaintiff later filed an amended complaint, alleging that the defendants were guilty of defaming him. Among other relief, the plaintiff sought compensatory and punitive damages; attorney's fees and costs; and treble damages. The defendants counterclaimed for damages pursuant to the Act, *see* Tenn. Code. Ann. § 47–18–109(e)(2) (2001), alleging that the plaintiff's case was "frivolous, without legal or factual merit, or [was] brought for the purpose of harassing the [defendants]." Sometime after the filing of the answer and counterclaim, the defendants filed a motion for summary judgment, along with a supporting brief and statement of undisputed facts. The plain-

---

1. The plaintiff originally filed suit in chancery court; however, the case was eventually transferred to circuit court where the trial was held.

tiff responded to the defendants' motion for summary judgment and filed a supporting memorandum.

After the trial court denied the defendants' motion for summary judgment, the complaint was heard before a jury.[2] The jury, in its verdict form, found (1) that the defendants violated the Act "by engaging in unfair and deceptive acts or practices that affected the bidding at the [auction]"; (2) that the defendants committed the tort of injurious falsehood "by publishing false and misleading statements"; and (3) that the defendants defamed the plaintiff by "publishing false and misleading statements." Based on these findings, the jury awarded the plaintiff $20,000 in damages, $10,000 to be paid by each defendant.

In response to post-trial motions, the trial court denied the defendants' motion for a new trial or to alter or amend the judgment; denied the plaintiff's motion for treble damages; and awarded the plaintiff $16,161.30 in attorney's fees. The defendants appeal, arguing that the trial court erred in finding that the Act applied to the facts of this case; in awarding the plaintiff attorney's fees under the Act; in denying their motion for damages under the Act; and in denying their motion for summary judgment. The defendants also argue that there was no material evidence to support the jury's verdict.

## II.

The issues presented for our review raise questions of law, as well as questions of fact. Our scope of review as to the trial court's conclusions of law is *de novo* with no presumption of correctness. *The Bank/First Citizens Bank v. Citizens*

*& Assoc.*, 82 S.W.3d 259, 262 (Tenn.2002) (citation omitted). Our scope of review with respect to factual determinations in jury trials is limited to determining whether there is material evidence to support the verdict. *Childress v. Union Realty Co.*, 97 S.W.3d 573, 576 (Tenn.Ct.App. 2002); *see also Forrester v. Stockstill*, 869 S.W.2d 328, 329–30 (Tenn.1994). We are not allowed to weigh the evidence. *Id.*, 869 S.W.2d at 329 (citation omitted). We are "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all [evidence] that tends to support [the verdict], allowing all reasonable inferences to sustain the verdict, and to discard all [evidence] to the contrary." *Forrester*, 869 S.W.2d at 329 (citation omitted). We must affirm the jury's verdict if there is any material evidence to support it. *Id.*

## III.

### A.

The defendants argue that the trial court erred in holding that the Act is implicated by the facts of this case. They contend the Act does not apply because they were not engaged in "any business" where they interacted with the plaintiff as a "consumer." We must decide the narrow question of whether, at the time these defendants engaged in the conduct of which the plaintiff complains, they were involved in an activity covered by the Act.

Statutory construction is a question of law for the court. *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn.2000). "It is well-settled that [our] role ... in construing statutes is 'to ascer-

---

**2.** The trial was held without a court reporter present; however, the parties agreed, with the trial court's approval, that the court clerk would record the trial with a cassette recorder. Due to technical or human error, a portion of the trial was not recorded. The recorded portion of the trial was later transcribed. The transcript was supplemented by a statement of the evidence with respect to the missing testimony.

tain and give effect to' the legislative purpose and intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83 (Tenn.2001) (quoting *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn.2000)).

The Act is to be "liberally construed" to "protect *consumers* and legitimate business enterprises from those who engage in unfair or deceptive acts or practices *in the conduct of* any *trade or commerce*." Tenn. Code Ann. § 47–18–102(2) (2001) (emphasis added); *see also Ganzevoort v. Russell*, 949 S.W.2d 293, 298 (Tenn.1997). The Act defines a "consumer" to include "any natural person who *seeks or acquires* . . . any . . . [real] property." · Tenn.Code Ann. § 47–18–103(2) (2001) (emphasis added). The terms "trade" or "commerce" are defined under the Act, in part, as "offering for sale . . . any . . . [real] property." Tenn.Code Ann. § 47–18–103(11) (2001) (emphasis added).

■ We hold the trial court erred in holding that the Act applies to the facts of this case. At the time these defendants engaged in the conduct of which the plaintiff complains, they were not involved in any activity covered by the Act. The *defendants* were not offering real property for sale. *See* Tenn.Code Ann. § 47–18–103(11). In fact, the defendants were not offering anything for sale. The defendants simply placed signs along their property in order to warn as many people as possible that the Armstrong Project was still a threat to their community. Such activity does not fall within the definition of "trade" or "commerce" under the Act.

The Act protects "consumer[s]." *See* Tenn Code Ann. § 47–18–102(2). In this case, the plaintiff seeks protection under the Act; however, the plaintiff in this case is *not* a consumer with respect to the defendants because he was not seeking to purchase anything from them. *See* Tenn. Code Ann. § 47–18–103(2). Instead, the plaintiff was acting as a seller because he was offering real estate for sale. Therefore, we hold that the trial court erred in holding that the Act applies to the facts of this case. Since the Act is not implicated by the evidence before us, we conclude that there is no material evidence to support the jury's finding that the defendants violated the Act.

### B.

■ The defendants argue that the trial court abused its discretion in awarding attorney's fees to the plaintiff because the Act does not apply to this case. We agree with the defendants. We hold that attorney's fees are not appropriate in this case. The fees were awarded by the court below because it erroneously held that the Act applied to the defendants' activities. Since the Act does not apply, the trial court erred in awarding attorney's fees under it.

### IV.

### A.

■ The defendants argue that the trial court erred in holding that there is a cause of action for injurious falsehood in Tennessee. We disagree with the defendants. We hold that such a cause of action does exist in this jurisdiction. "Libel of title has long been recognized as an actionable tort in Tennessee," *Ezell v. Graves*, 807 S.W.2d 700, 701 (Tenn.Ct.App.1990) (citing *Smith v. Gernt*, 2 Tenn. C.C.A. (Higgins) 65 (1911)). The common law tort of injurious falsehood includes, among other things, the common law tort theories of libel and slander of title. *See id.* at 702–703; *see, e.g.*, Restatement (Second) of Torts §§ 623A, 624 (1977). In *Ezell*, we relied on a portion of the Restatement (Second) of Torts dealing with "injurious

falsehood." *Id.* at 703. *Ezell* is a case pursued on a theory of *libel of title.* Nevertheless, we recognized in that case that such a cause of action was an example of the tort of injurious falsehood by using § 633 of the Restatement (Second) of Torts—an injurious falsehood section—to delineate the type of pecuniary loss recoverable in *Ezell. Id.*

### B.

The defendants argue that, assuming injurious falsehood is recognized in Tennessee, there is no material evidence to support the jury's verdict that the defendants were guilty of committing this tort. They also argue that there is no material evidence that they committed the tort of defamation.

### C.

In order to establish a claim for injurious falsehood, a plaintiff must establish the following:

One who publishes a *false* statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Restatement (Second) of Torts § 623A (emphasis added). The Restatement (Second) of Torts § 624 further explains that "[t]he rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of a *false* statement disparaging another's property rights in land . . . that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of

third persons in respect to the other's interests in the property." (Emphasis added).

 As with defamation, it is important to remember that truth is a defense to injurious falsehood. The applicable rule states that the "publisher" of a statement "is not liable for injurious falsehood if the facts stated, or implied as justification for an opinion stated, are true." Restatement (Second) of Torts § 634 (1977).

### D.

 The Supreme Court in *Press, Inc. v. Verran,* 569 S.W.2d 435 (Tenn.1978) adopted § 580B of the Restatement (Second) of Torts (1977) as the standard to determine whether a private person has been defamed. *Id.* at 442; *see also Ferguson v. Union City Daily Messenger, Inc.,* 845 S.W.2d 162, 165–66 (Tenn.1992). The standard quoted by the Supreme Court is as follows:

Defamation of Private Person. One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them.

*Verran,* 569 S.W.2d at 442 (quoting Restatement (Second) of Torts § 580B (1977)). The plaintiff bears the burden of proving "that a false and defamatory statement was published concerning the plaintiff." *Pate v. Serv. Merch. Co.,* 959 S.W.2d 569, 573 (Tenn.Ct.App.1996). Therefore,

truth is also a defense to a claim alleging defamation.

### E.

The facts surrounding the plaintiff's claim that the defendants committed the tort of injurious falsehood are the same as those supporting the plaintiff's claim based upon an alleged defamation. The plaintiff argues that the statements on the signs make out his suit for injurious falsehood and defamation. As previously stated, the signs contained the following language: "ARMSTRONG WANTS MY LAND"; "DON'T LET ARMSTRONG TAKE OUR LANDS"; "ENTERING ARMSTRONG Land—Theft Area 'By Imminent [sic] Domain'"; "LAND PAST HERE MAY BE SUBJECT TO EMINENT DOMAIN"; and "PROPOSED PUMP STORAGE BOUNDARY LINE."

 The issue before us is whether the subject signs contain false statements conveying a defamatory message. "The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener." *Pate*, 959 S.W.2d at 574. In Tennessee, "extrinsic facts may ... be used to show the defamatory meaning of words that are not defamatory on their face." *Id.* As we have previously noted in this opinion, truth is a defense to both the tort of injurious falsehood and the tort of defamation.

 We hold there is no material evidence in the record to support a finding that the statements on the signs are false. In this case, the "extrinsic facts" before the jury, instead of showing a false statement, demonstrate that the signs convey true concepts and/or opinions of the publishers supported by true facts. When the signs are read in the context of what had transpired with respect to the company's possible acquisition of land in this area by way of eminent domain, the signs can only be construed as statements that the land in the area, including the land to be auctioned by the plaintiff, might be subject to a taking by eminent domain in connection with the Armstrong Project. As so construed, the statements are true. The evidence before us reflects that the Armstrong Project had been delayed, not abandoned, at the time of the auction. In the context of the history of the company's involvement in this area, the statements express true facts, and, hence, the defendants have a complete defense to the plaintiff's causes of action for defamation and injurious falsehood. Even if a reader of the signs had not had any knowledge regarding the history of the Armstrong Project, he or she could only have concluded that a person or entity named "Armstrong" wanted land in the area, that the land might be taken by eminent domain, and that a "pump storage" was in some way involved. This is all that the uninformed reader would have learned from the signs and, even at that, he or she probably would have been somewhat puzzled as to the meaning of the words displayed on the signs; however, in any event, the uninformed reader would not have been exposed to any false statements. To the extent the signs express an opinion, "the facts stated, or implied as justification for [the] opinion stated, are true." Restatement (Second) of Torts § 634. Therefore, we hold that there is no material evidence in the record to support the jury's implicit finding of a false communication. There is simply no material evidence before us showing that any of the statements on the various signs, when posted, were false. The posting of the signs may well have affected the willingness of the attendees at the auction to bid, but this was not because of any false statements. There is no evidence of the

threshold element of these two causes of action, *i.e.*, a false statement.

### V.

 The defendants argue that the trial court erred in denying their motion for summary judgment. It is well-settled that "[a] trial court's denial of a motion for summary judgment, predicated upon the existence of a genuine issue of material fact, is not reviewable on appeal when a judgment is subsequently rendered after a trial on the merits." *Bradford v. City of Clarksville*, 885 S.W.2d 78, 80 (Tenn.Ct. App.1994); *see also Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn.Ct.App. 1989); *Mullins v. Precision Rubber Prods. Corp.*, 671 S.W.2d 496, 498 (Tenn.Ct.App. 1984); *Tate v. County of Monroe*, 578 S.W.2d 642, 644 (Tenn.Ct.App.1978). Thus, we cannot consider this issue.

### VI.

Finally, the defendants argue that the trial court abused its discretion in refusing to award them damages, including reasonable attorney's fees and costs pursuant to the Act. Under Tenn.Code Ann. § 47–18–109(e)(2), "[i]n any private action commenced under this section, upon finding that the action is frivolous, *without legal* or factual *merit*, or brought for the purpose of harassment, the court *may* require the person instituting the action to indemnify the defendant for any damages incurred, including reasonable attorney's fees and costs." (Emphasis added). As is clear from the language of the statute, the decision to award attorney's fees under the Act rests within the discretion of the trial court. The defendants argue under Tenn. Code Ann. § 47–18–109(e)(2) that the plaintiff's action lacked legal or factual merit because the defendants (1) did not have a relationship with the plaintiff that was covered under the Act; (2) the defen-

dant's actions did not constitute "deceptive trade practices"; and (3) the defendants "were not engaged in any business or trade" as required under the Act. Furthermore, the defendants argue that the plaintiff filed the suit apparently to "harass the defendants for [the plaintiff's] unsuccessful auction."

We have previously held in this opinion that the plaintiff's suit under the Act was "without legal ... merit." Accordingly, we remand this case to the trial court so it can exercise its discretion under Tenn. Code Ann. § 47–18–109(e)(2) by determining whether, and, if so, to what extent, the defendants are entitled to damages under the Act for services rendered in the trial court and on appeal.

### VII.

We hold that there is no material evidence to support the jury's verdict in this case. Accordingly, we reverse the judgment of the trial court and dismiss the plaintiff's complaint with costs at trial and on appeal taxed to James L. Wagner, M.D. We remand for further proceedings.