IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 15, 2013

# PATSY R. COWART, ET AL. v. LINDA M. HAMMONTREE

**Appeal from the Chancery Court for McMinn County**
**No. 2011-CV-28      Jerri S. Bryant, Chancellor**

### No. E2013-00416-COA-R3-CV-FILED-NOVEMBER 27, 2013

Patsy Reba Cowart, Debbie Buff, and David Buff (collectively "Plaintiffs") sued Linda M. Hammontree to establish a boundary line and quiet title on a parcel of real property located in McMinn County, Tennessee. Ms. Hammontree answered and filed a counterclaim for trespass and slander of title, among other things. After trial, the Trial Court entered judgment finding and holding, *inter alia*, that Plaintiffs had superior title to the disputed real property. Ms. Hammontree appeals to this Court raising issues regarding whether the Trial Court erred in finding that Plaintiffs rebutted Ms. Hammontree's presumption of ownership pursuant to Tenn. Code Ann. § 28-2-109, and whether the Trial Court erred in dismissing Ms. Hammontree's claim for slander of title. We find and hold that the evidence preponderates against the finding that Plaintiffs rebutted Ms. Hammontree's presumption of ownership, but that the Trial Court did not err in dismissing Ms. Hammontree's claim for slander of title. We reverse, in part, and affirm, in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed, in part; Affirmed, in part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, and THOMAS R. FRIERSON, II, JJ., joined.

Sarah E. Kennedy, Athens, Tennessee, for the appellant, Linda M. Hammontree.

Russell J. Blair, Athens, Tennessee, for the appellees, Patsy R. Cowart, Debbie Buff, and David Buff.

## OPINION

## Background

The real property in dispute in this case is a roughly triangular-shaped parcel of approximately one third of an acre located in McMinn County, Tennessee ("Disputed Area"). The Disputed Area lies adjacent to real property owned by Ms. Cowart and is across a road from real property owned by Ms. Hammontree. Debbie Buff and David Buff are Ms. Cowart's daughter and son-in-law, respectively.

In November of 2009, Plaintiffs discovered that there was an issue with regard to ownership of the Disputed Area. Plaintiffs sued Ms. Hammontree in February of 2011 seeking to establish the boundary line and to quiet title. Ms. Hammontree answered and filed a counterclaim.[1] The case was tried without a jury in August of 2012.

At trial Paul R. Lingerfelt, a registered land surveyor, testified as an expert for Ms. Hammontree. Mr. Lingerfelt surveyed the property in 1996, but was not aware of a dispute until early in 2011. Mr. Lingerfelt explained that he surveyed in 1996 for the estate of Edd Miller in order to divide the property among Mr. Miller's children or grandchildren. Ms. Hammontree is one of Mr. Miller's grandchildren.

Mr. Lingerfelt's survey shows the Disputed Area as part of the Miller farm. When asked what he based this conclusion on, Mr. Lingerfelt stated:

> I based it on Mr. Miller's deed, and he had a plat that was recorded in 1934 that shows the disputed area as being his. I based it on Ms. Cowart's deed saying she bordered the Miler property on the south, and there was a fence there along that line. And also when you trace Ms. Cowart's property back to where it was cut, what deed it was cut from, it was cut from a 160-acre tract that said it was the southwest quarter section of section 15. . . . Cowart's deed says - - Cowart's deed has got a description with footage and general directions. It doesn't have bearings. It's not a surveyed description. It's got footage and a general direction. But his deed also says it borders Miller on the south.

---

[1] There was some confusion procedurally in the Trial Court with regard to a notice of voluntary non-suit that may have been granted by the Trial Court, but later was attempted to be withdrawn. This confusion resulted in argument regarding the proper order of proof at trial. We need not discuss in this Opinion the procedural confusion as we agree with the Trial Court that the confusion did not impact the issues tried or the burden of proof, and no such issues were raised on appeal.

Now, Cowart couldn't border Miller on the south if it's her property. She would border the road. But to trace Ms. Cowart's deed back to where it was a whole, part of another tract, it was part of the section 15, the southwest quarter of section 15. And Mr. Miller's property all lies in section 22. The Cowart deed doesn't say anything about them ever owning anything in section 22. That's my reasons for surveying it that way.

Mr. Lingerfelt explained that the Hammontree property and the property of her predecessors in title was all located in section 22 of the county tax map, and that the Cowart property was all located in section 15. The deed from which Ms. Cowart's property was cut contained 160 acres lying in the southwest quarter of section 15. This deed in Ms. Cowart's chain of title does not state that any of the Cowart property lies in section 22. Mr. Lingerfelt explained that the Disputed Area is entirely in section 22. When asked, Mr. Lingerfelt admitted that the section lines were established "when the government got this land from the Indians in 1800 something," and that they do not necessarily correspond to ownership as people "could own property in two or three sections."

Mr. Lingerfelt explained that in the 1984 deed from C.M. Cowart and Peggy Cowart to Patsy Cowart the portion reading: "Hence along the meanderings of the same road in an easterly direction 300 feet, more or less, to the Bonner farm line . . . generally bounded on the south by Ed [sic] Miller and on the east by Bonner," constitutes a discrepancy because "it can't do both. If you come with the meanderings of the road in an easterly direction 300 feet, you're coming down into section 22, which he didn't have any right to deed. And it wouldn't bound - - it wouldn't be bounded by Ed [sic] Miller. It would be bounded by the road." He testified that evidence was found of a fence when he did his 1996 survey that corroborated what was in the deeds. Mr. Lingerfelt also found three fence posts on the corners. He did not locate any fence along the road.

Mr. Lingerfelt testified that Ms. Hammontree contacted him in 2011 to re-mark the corners on the small triangle of the Disputed Area. His crew went out to do the work and discovered that the fence was gone. Someone came from the Cowart side of the property and told Mr. Lingerfelt's crew that they would not allow them to survey, so the crew left. Mr. Lingerfelt then sent a registered letter to Ms. Cowart stating that they had a right to survey. He explained that after sending the letter they waited two weeks and then went back and surveyed without incident.

Mr. Lingerfelt marked the line with iron pins on the corners and wood stakes and prepared a plat dated in February of 2011. He opined that the Disputed Area was part of the Miller property. He explained that he based his opinion:

on Mr. Miller's deed and plat that was recorded in 1934. I base it on the fence being on the line. I base it on Ms. Cowart's deed calling for her bordering on Mr. Miller on the south. I believe I mentioned the fence, didn't I? . . . And the deed that it was cut from. They only owned property in section 15.

When asked, Mr. Lingerfelt explained that he personally did not do the field work, but his crew did. He also explained that they did not re-pull and re-review the deeds in 2011, but instead relied upon their plat, which they had researched when Mr. Lingerfelt did the survey in 1996. He explained that they pulled deeds back to the 1934 conveyance to Edd Miller when they did the 1996 survey but did not go further back than this. The 1934 plat showed Mr. Miller's property as two separate pieces of property.

Linda Miller Hammontree testified about how she obtained ownership of her property. She explained that her father owned around 130 to 150 acres, and in 1996 he decided to divide the property up between Ms. Hammontree and her two siblings. Ms. Hammontree testified that she lived in Georgia at the time of trial. Ms. Hammontree had not lived on the property in approximately 40 years, but testified she visits her mother frequently, who does live on the property. Ms. Hammontree testified that she has known the Cowart family for years and that relations between her family and the Cowart family had been "very amicable" until this suit.

Ms. Hammontree's parents and, prior to that, her grandparents lived on the Miller farm. Ms. Hammontree testified that her grandmother planted creeping phlox in the Disputed Area. She testified that the Disputed Area was mostly wooded with nothing but her grandmother's phlox, roses, and sweet pea vines on it. Ms. Hammontree recalled her grandmother maintaining the creeping phlox since Ms. Hammontree was six or seven years old and testified that the phlox still was maintained. Ms. Hammontree's mother maintains the phlox by weeding. Ms. Hammontree testified that at one point the county wanted to straighten the road and her grandmother argued with them that they could not because of her flowers, so the road was left alone. Ms. Hammontree explained that the Disputed Area serves as a buffer between her mother's property and the Cowart property, which she stated: "it's not landscaped. There's old barrels, old boats, old cars. It's not maintained. Again, I say with all due respect, it's not something I would want to look at."

Ms. Hammontree testified that at some point in the past Warner Johnson, Ms. Cowart's step-father, bought some property near the Miller farm and started to build on the Disputed Area. Ms. Hammontree testified that her brother and her grandfather had a conversation with Mr. Johnson wherein Mr. Johnson was told the Disputed Area belonged to the Miller family, so Mr. Johnson stopped building there and moved down the road where he then built his house.

Thomas Wendell Miller, Ms. Hammontree's brother, testified about the conversation with Warner Johnson, which he stated occurred around 1960, stating:

Well, Mr. Johnson had bought land north of the [disputed] triangle from Chester McKeehan, and he and his wife were going to build a house. But Warner Johnson didn't know about the triangle, so he was cutting bushes to build a house on the triangle. So my grandfather told me to go over there and ask them what they were doing. So I went over there and I talked to Mr. Johnson, and I was, I don't know, 10 or 12 years old, maybe, and I asked him what he was doing. And he said he was clearing off, getting ready to build a house. So my grandfather had told me to ask him if he knows where the corner is, the boundary for the property. I asked him that, and he did not know so I showed it to him. Well, he didn't argue or - - he just moved on north down on his property farther and cleaned off a spot and built a house.

Mr. Miller explained that Mr. Johnson had started clearing out in the Disputed Area, but that Mr. Johnson built his house farther north. He explained that Mr. Johnson's house was built farther north than the house where Ms. Buff currently resides. Mr. Miller testified that he knew where the boundary was because his grandfather and father had "told me and showed me where the iron pin was, and also three notches in a big gum tree that marked the boundary." Mr. Miller testified that someone later pulled up the iron pin and threw it away.

Ms. Hammontree testified that no one else ever had claimed to own the Disputed Area until this suit. The tax cards and maps show the Disputed Area as part of Ms. Hammontree's property and not the Cowart property. Ms. Hammontree testified that she herself has paid the property taxes on the Disputed Area since 2000 and that prior to that her family paid them.

Ms. Hammontree received a letter in July of 2010 from an attorney representing Plaintiffs. Ms. Hammontree testified that the letter stated that Plaintiffs thought they owned the Disputed Area, but offered to buy it for $500. This was the first time Ms. Hammontree ever had heard anyone else make claim to the Disputed Area. Ms. Hammontree then checked the boundary lines and discovered that the fence no longer was there. Ms. Hammontree then hired Mr. Lingerfelt to resurvey the Disputed Area and posted no trespassing signs.

Charlotte Elizabeth Miller, Ms. Hammontree's mother, testified that she has lived on the Miller farm since she married Howard Thomas Miller in 1948. Her house is across the road from the Disputed Area. Prior to her husband's death in 1999, Ms. Miller and her husband divided the Miller farm among their three children. Ms. Hammontree received

approximately 40 acres including the house where Ms. Miller resides under a life-time estate.

Ms. Miller testified that she sees the Disputed Area "[e]very day. And sometimes more than that," and that as far back as she can remember the Miller family exercised exclusive control over the Disputed Area. She has allowed neighboring children to play on the property. Ms. Miller testified that the Disputed Area is wooded, that her mother-in-law planted flowers in the Disputed Area, and that nothing else ever has been planted in the Disputed Area. The creeping phlox her mother-in-law planted still exist in the Disputed Area.

When asked about the incident with Warner Johnson, Ms. Miller testified:

> Well, he was cleaning off the place directly in front of my house on the triangle, and he was asked why he was cleaning it, and he said, "to build a house." And my father-in-law told him it was not his property. And Mr. Johnson moved on down the road - - I don't know how to estimate land, but just on down the road from there - - and built his house. And we heard no more complaints from Mr. Johnson. . . . He accepted it and built his house.

Ms. Miller was in her house during the conversation between her family members and Mr. Johnson. Her father-in-law and her son, Thomas Miller, spoke to Mr. Johnson.

Ms. Miller testified that there is a driveway between Ms. Buff's house and the Disputed Area. Ms. Miller gave the Cowart children permission to play in her yard. She stated: "They used to come up and play ball in my yard. They didn't have a yard down there, so they'd come up to my house to play any time they wanted to. But I told them they could." She testified that the Cowart children did not play in the Disputed Area. Ms. Miller never has seen anyone use the Disputed Area without her permission. Ms. Miller testified that when the dispute arose there was a fence in the Disputed Area "but it was an old fence, and part of it was down. And we also had an iron post as our marker. And both of them are gone." Ms. Miller was asked if the fence enclosed the entire Disputed Area and she stated: "Yes. It went - - except - - it went on the back side, and the road is on the front side of it."

Patsy Cowart, who was 71 years old at the time of trial, testified that she had lived on her property since she was approximately 15 or 16 years old. She explained that her mother and step-father, Warner Johnson, purchased the property and built a house. With regard to the construction of this house, Ms. Cowart testified:

> We was up there cleaning off. We hadn't even started the house. And Howard Miller come over and told Warner [Ms. Cowart's step-father], says:

I don't think you want to clean this off. You don't need to do this. He says: Yes, I do. He said: You don't own the land. I just bought it from Chester McKeehan, so we do own it. And he told him, he said: You can talk to Chet about it if you want to.

Ms. Cowart testified that she was present during this conversation. She said that after the conversation she and her family continued to clean up in the Disputed Area, but that the house was not built there. She stated that her step-father "wasn't going to build the house [in the Disputed Area] anyway, or I don't think he was. Like I say, we was just cleaning the place off."

Ms. Cowart testified that her family lived in the house her step-father built until her mother died in 1969, and then her step-father sold the house to the Beckmans. She later clarified that her step-father sold to H.B. Calhoun who sold it to the Beckmans a few days later. The Beckmans lived in the house for a while, and then the house burned. Ms. Cowart testified that the Beckmans did not want to rebuild after the fire. So, in 1971, she and her husband purchased the property from the Beckmans. Ms. Cowart and her husband then "cleaned up where the house had burned," and built a new house. Ms. Cowart explained that Debbie Buff is her daughter and that Ms. Buff also lives on her property. Ms. Buff holds a power of attorney for Ms. Cowart.

Ms. Cowart testified that she has believed since she began living there in 1971 that she owns the Disputed Area, and that she never had any indication that anyone else claimed ownership of the Disputed Area. Ms. Cowart testified that her husband built a fence in the Disputed Area, and that they kept ponies. She also testified that they cut small trees in the Disputed Area and used them for firewood.

Ms. Cowart was asked when she discovered that there was an issue regarding the Disputed Area, and she testified that it was when she attempted to convey the property to her children. She stated that they consulted an attorney and sent a letter to Ms. Hammontree. Ms. Cowart was asked if she ever made any offers to purchase the Disputed Area, and she stated: "No, I didn't. Our lawyer told us that since Linda [Hammontree] lived down there in Georgia or wherever, he said that we could give her something for her troubles of coming up here, and he suggested the $500," to clear up the title.

Frank Thurston surveyed the Disputed Area for Ms. Cowart and testified as an expert. Mr. Thurston was asked if his survey was conducted based upon a property description and he stated: "Yes and no. I surveyed what I found in the field and then I compared it to the description, and then I went back and matched it up." When asked which description he was referring to, Mr. Thurston stated: "I started with Sneed and I followed it

all the way through to Ms. Cowart. . . . [Sneed in 1952 is] the first time this parcel was broken off of this one, the main tract over there." He testified that in 1952 Grant Sneed sold the Disputed Area to Chester McKeehan.

Mr. Thurston testified that by way of research for his survey he:

> looked up Hammontree's deed and the previous deeds to that tract. I looked up the deed to the disputed triangle. I got Shults, Bonner. I went back to Gregory, which is 1898, and I got these deeds all the way down. Then I went back [the Hammontree tract] - - all the way back to Horace Dyer. . . . Dyer to Shults was '06.

Mr. Thurston testified that the first time the Disputed Area was included in the Hammontree property was after the 1934 survey. He stated: "The original Bonner never went that far at all." Mr. Thurston opined that the Disputed Area is on the Cowart property. Mr. Thurston was asked what the only diversion from that opinion was, and he stated: "This description right there that came over about that other plat, this plat right here was done when it went across. . . . '34. After this plat the descriptions did take in the little triangle. . . . The Hammontree description actually describes it as a separate tract, not as part of the original boundary." When asked who described it, Mr. Thurston stated: "Whoever wrote the deed. . . . I think it's Shults to Ed [sic] Miller." He further stated: "At any rate when Hammontree acquired the property from Miller, and I think Miller was her father or grandfather, they described the little triangle as a separate tract of land."

Mr. Thurston opined that the 1934 plat was wrong, but stated "[b]ut there again, we've got overlapping descriptions and it's a matter of a lot of interpretation." He admitted that there is a description of the Disputed Area in the Hammontree chain of title that goes back to 1906 in the deed from Dyer to Shults. He explained "that's where I said there are overlapping descriptions."

Mr. Thurston admitted that his labeling of the sections may contain error, and stated he is working with the GIS department to determine exactly where the section is. He explained that the tax map shows that his label of the section is "a half section off." He further stated: "One of us is wrong. . . . I'm going to say until I do further research and some field investigation with the GPS equipment, the jury is out." Mr. Thurston explained:

> I went back to the GIS department, and I said let's attempt to put this on your GIS map, which, it does not have it. They dropped it. He said: I cannot put it in my computer based until you find me some original corners in the field and tie them to state plane coordinates.

-8-

I would say that we're fairly close right here, but the GIS department and the assessor's office was not comfortable enough to continue to carry these section numbers.

When asked, Mr. Thurston agreed that the Disputed Area is in section 22. He also agreed that the first time the description of the Disputed Area came up in the Cowart chain of title was in the 1952 deed from Grant Sneed to Chester McKeehan. The deed prior to the Sneed to McKeehan deed contained section numbers and stated the Cowart property was in sections 15 and 16. Mr. Thurston agreed that based upon the Cowart chain of title the Cowart's have no claim to anything in section 22. He stated: "Assuming that the people that sold to Cowart did not have any claim. I don't know how far back the screw-up came in, but Patsy Cowart purchased that description and it just came from a chain of title all the way from Grant Sneed."

The deed from Sneed to McKeehan states the Cowart property is a triangular shape, and Mr. Thurston stated that it looked more "like a teardrop with half of it cut off." He admitted that the shape would be closer to a triangle if the Disputed Area were cut out. He also admitted that somewhere along the line in the Cowart chain of title there is a discrepancy of "6.9. We pick up five or six feet. Between old deeds and what we find in the field are dropped five or six feet every day. That's not unusual."

Mr. Thurston testified that the Cowart property description states it is bounded on the south by Edd Miller, not a road. He agreed that it would be more correct if the description stated it was bounded by the road, but stated: "It would be more proper but not necessarily happened." Mr. Thurston agreed that the 1934 plat shows the Disputed Area as part of the Miller farm, or what is now the Hammontree property. He found evidence of fence wire in the trees on two sides of the Disputed Area. Mr. Thurston admitted when asked that the Millers have the prior right of title on paper, as there was a deed in the Hammontree chain of title prior to 1919 that included the Disputed Area, and stated: "I think it's a trust deed, but I don't remember."

Deborah Cowart Buff testified that she is Patsy Cowart's daughter. Ms. Buff's house is across the road from Ms. Hammontree's property, and Ms. Buff testified that she has lived on the property for approximately 49 years. She testified that her house, which she built in 1997, is approximately 25 yards from the Disputed Area.

Ms. Buff testified that she first discovered that there was a dispute about who owned the Disputed Area around Thanksgiving of 2009 when her mother got sick and wanted to divide the land between Ms. Buff and Ms. Buff's brother. Ms. Buff testified that

she went "to the courthouse to the assessment room" and that is when she discovered that Ms. Hammontree claimed ownership of the Disputed Area.

Ms. Buff testified that she had always believed the Disputed Area belonged to her grandmother, and stated she played there when she was a child, and that her family fenced in part of the Disputed Area because her father got them ponies. Ms. Buff and her brother helped her father to put up the barbed wire fence, which was hammered into the trees. Ms. Buff drew the fence on an exhibit entered at trial, which depicted the Disputed Area and the surrounding properties. The fence line as drawn by Ms. Buff runs west to east roughly along the northern border of the Disputed Area and then turns and runs in a north/south direction on Ms. Cowart's property. The fence as drawn by Ms. Buff appears to be only a few feet at most within the actual northern boundary line of the Disputed Area. Ms. Buff testified that the fence line was "zigzagging in with the trees." The fence as drawn by Ms. Buff does not enclose the Disputed Area, but runs only along the northern side of it with the road being along the southern side. Ms. Buff testified that the fence "was found up against the trees in that area." She also admitted that the ponies were kept to the north of the fence, which would have been on Ms. Cowart's property.

Ms. Buff also testified that her father used the Disputed Area to put farm equipment, and that her brother put junk in the Disputed Area. Ms. Buff testified that she has never known the Miller family or Ms. Hammontree to use the Disputed Area. She stated that she does not know Ms. Hammontree well, but that her son "thought highly of [Ms. Hammontree]," and spent time with her.

Ms. Buff admitted that the Disputed Area is completely within section 22. She agreed that the 1902 deed from W.T. Gregory and Mary Gregory to W.G. Kelly, W.R. Kelly, and M.B. Kelly in her mother's chain of title describes the property as being only in sections 15 and 16. When asked if she believed it would be impossible to convey property in section 22 if one only owned property in sections 15 and 16, Ms. Buff stated:

> No, it would not really be impossible because, like I said, they've got the sections made out. But somebody came up through there and went down between the little valleys of it and made a little bitty road trail. As they turn that corner, what looked to be that line turned down in the low part, so they went over in that area. . . . Where they're cut lines through the lower parts of it? That happened in the older times when they didn't have - -

Ms. Buff was asked if she could point to any specific language in the deeds in the Cowart chain of title which do what she claims, and she stated: "No."

Ms. Buff was asked if she had hired another surveyor during the pendency of this suit, and she stated that she "had a Mr. Ball who came out there. Well, it wasn't Mr. Ball. It was some other man who was in with him, partnership or something." She stated: "they had done the survey on it and said that it showed that it went around the road, all the way around it, but they couldn't distinguish where the 300-foot point started." Ms. Buff was asked why she never furnished any information about Mr. Ball or his engineer during discovery, and she stated: "That's because he didn't follow through on anything, and he just said that he was going to - - he never gave me anything showing anything had been done, so I didn't have anything of any discovery to give you in that area." Ms. Buff claimed that she had given her former attorney the information about Mr. Ball or his engineer, and stated that her former attorney "was supposed to have sent you papers saying that there was a surveyor who was going to be doing it. So - - . . . . So I do not have anything that [my former attorney] did because he lost it." Ms. Buff was asked if it were true that Mr. Ball or his engineer had advised her that they could not establish that the Disputed Area was on her property, and she stated: "No. The only thing that I was told is they could not distinguish where the 300 foot, going around the curve, they did not know where to start counting the 300 foot. . . . They would not put the seal on it that they could not establish a point."

After trial, the Trial Court entered its judgment on January 16, 2013 finding and holding, *inter alia*, that Plaintiffs had superior title to the Disputed Area, and dismissing Ms. Hammontree's claim for slander of title. Ms. Hammontree appeals to this Court.

## **Discussion**

Although not stated exactly as such, Ms. Hammontree raises what we consolidate as two issues on appeal: 1) whether the Trial Court erred in finding that Plaintiffs had rebutted the presumption of ownership that arose pursuant to Tenn. Code Ann. § 28-2-109 by showing partial adverse possession or otherwise; and, 2) whether the Trial Court erred in dismissing Ms. Hammontree's claim for slander of title.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in finding that Plaintiffs had rebutted the presumption of ownership that arose pursuant to Tenn. Code Ann. § 28-2-109 by showing partial adverse possession. Ms. Hammontree argues in her brief on appeal that

the Trial Court erred in making findings with regard to Ms. Hammontree's chain of title. The Trial Court found that W.H. Bonner conveyed property to the Millers. The Trial Court further found that W.H. Bonner never owned the Disputed Area and could not have conveyed it to the Millers. W.H. Bonner, however, never conveyed any property to the Millers. Ms. Hammontree argues that the deeds in her chain of title show that the Disputed Area is part of the property conveyed by the Shults to the Millers in 1934. As such, Ms. Hammontree argues that the Trial Court "did not have a clear understanding of the chain of titles and arguments for either party."

After a careful and thorough review of the record on appeal, we find that even if the Trial Court erred in finding that W.H. Bonner never owned the Disputed Area and could not convey it, and that this directly impacted Ms. Hammontree's title, such error was harmless because the Trial Court properly found that Tenn. Code Ann. § 28-2-109 applied to the case, and properly found that pursuant to this statute Ms. Hammontree had a presumption of ownership of the Disputed Area. Thus, even if the finding about Ms. Hammontree's chain of title was error, it was harmless error as our considering the record as a whole shows that it did not "more probably than not [affect] the judgment or … result in prejudice to the judicial process." Tenn. R. App. P. 36 (b).

As pertinent to the issue of whether the Trial Court erred in finding that Plaintiffs had rebutted Ms. Hammontree's presumption of ownership, Tenn. Code Ann. § 28-2-109 provides:

> **28-2-109. Presumption of ownership from payment of taxes. –** Any person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom such person claims have paid, the state and county taxes on the same for more than twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom such person claims have had, such person's deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for such period of more than twenty (20) years, shall be presumed prima facie to be the legal owner of such land.

Tenn. Code Ann. § 28-2-109 (2000). Thus, if a party has paid taxes continuously for more than twenty years and has assurance of title that has been of record for more than twenty years, a rebuttable presumption of ownership arises under Tenn. Code Ann. § 28-2-109. *Eg. Corrado v. Hickman*, 113 S.W.3d 319, 324 (Tenn. Ct. App. 2003); *Welch v. A.B.C. Coal Co., Inc.*, 293 S.W.2d 44, 50 (Tenn. Ct. App. 1956).

The evidence in the record on appeal shows that Ms. Hammontree and her predecessors paid taxes on the Disputed Area for more than twenty years. The evidence also shows that Ms. Hammontree had recorded assurance of title to the Disputed Area for more than twenty years. Plaintiffs' own expert surveyor, Mr. Thurston, testified the 1906 deed from Dyer to Shults is in Ms. Hammontree's chain of title and that it included the description of the Disputed Area. So the evidence shows Ms. Hammontree had recorded assurance of title to the Disputed Area for more than twenty years. As such, the evidence in the record on appeal does not preponderate against the Trial Court's finding that Ms. Hammontree was entitled to a presumption of ownership of the Disputed Area pursuant to Tenn. Code Ann. § 28-2-109.

The Trial Court found that "Cowart has rebutted the presumption that arose by the payment of taxes," by showing "an implied description" in their chain of title, that they had "partially adversely possessed to the fence line . . .," and that Ms. Hammontree had the Disputed Area "as part of a deed description which couldn't be conveyed."

With regard to the finding that Ms. Hammontree had the Disputed Area "as part of a deed description which couldn't be conveyed," as discussed above, the Trial Court found that Ms. Hammontree claimed title through a deed from Bonner to Miller, but that Bonner never owned the Disputed Area. The evidence in the record on appeal, however, shows that Ms. Hammontree's chain of title does not contain any conveyance from Bonner to Miller. Instead, Plaintiffs' expert surveyor, Mr. Thurston, testified that there is a description of the Disputed Area in the Hammontree chain of title that goes back to 1906 in the deed from Dyer to Shults. Thus, the evidence preponderates against the finding that Ms. Hammontree had the Disputed Area "as part of a deed description which couldn't be conveyed." Plaintiffs' expert admitted that Ms. Hammontree had a description of the Disputed Area within her chain of title in the 1906 deed from Dyer to Shults.

It is unclear from the record what the Trial Court meant when it found that Plaintiffs had superior title by virtue of an "an implied description" in their chain of title. Plaintiffs bore the burden of rebutting Ms. Hammontree's presumption of ownership pursuant to Tenn. Code Ann. § 28-2-109. The evidence shows that Plaintiffs' expert, Mr. Thurston, testified that Ms. Hammontree had the description of the Disputed Area in her chain of title as far back as 1906. Furthermore, he testified that the description of the Disputed Area was in the 1934 deed in Ms. Hammontree's chain of title from A.W. Shults and Ethel Shults to Edd Miller and Maude Miller, which references the 1934 survey. Mr. Thurston further testified that the first time the description of the Disputed Area came up in the Cowart chain of title was in the 1952 deed from Grant Sneed to Chester McKeehan. The deed prior to the Sneed to McKeehan deed contained section numbers and stated the Cowart property was in sections 15 and 16. Mr. Thurston agreed that the Disputed Area is in section

22. Ms. Buff also admitted that the Disputed Area is completely within section 22, and agreed that the 1902 deed from W.T. Gregory and Mary Gregory to W.G. Kelly, W.R. Kelly, and M.B. Kelly in Plaintiffs' chain of title describes the property as being only in sections 15 and 16. Given all this, the evidence preponderates against the finding that Plaintiffs rebutted Ms. Hammontree's presumption of ownership by showing superior title.

With regard to the Trial Court's finding that Plaintiffs "partially adversely possessed to the fence line . . . ," we note that our Supreme Court has instructed:

> In order to establish adverse possession under [the common law] theory, or in any statutorily based claim, the possession must have been exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. *Hightower v. Pendergrass*, 662 S.W.2d 932, 935 n.2 (Tenn. 1983); *cf. Menefee v. Davidson County*, 195 Tenn. 547, 260 S.W.2d 283, 285 (Tenn. 1953). Adverse possession is, of course, a question of fact. *Wilson v. Price*, 195 S.W.3d 661, 666 (Tenn. Ct. App. 2005). The burden of proof is on the individual claiming ownership by adverse possession and the quality of the evidence must be clear and convincing. *O'Brien v. Waggoner*, 20 Tenn. App. 145, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936). The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact. *Kirkman v. Brown*, 93 Tenn. 476, 27 S.W. 709, 710 (Tenn. 1894). When an adverse possessor holds the land for a period of twenty years, even absent any assurance or color of title, the title vests in that possessor. *Cooke v. Smith*, 721 S.W.2d 251, 255-56 (Tenn. Ct. App. 1986).

*Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 377 (Tenn. 2007). As our Supreme Court stated in *Bensdorff v. Uihlein*: "the law is well settled that inclosure is unnecessary to establish actual possession where such inclosure is impracticable, but possession may be established by such use and occupation as the land, from its situation, nature, and character, admits." *Bensdorff v. Uihlein*, 177 S.W. 481, 482 (Tenn. 1915).

Additionally, this Court has explained that: "Occasional use of land through cultivation, cutting grass or timber or the grazing of stock is not sufficient to establish adverse possession." *Cusick v. Cutshaw*, 237 S.W.2d 563, 567 (Tenn. Ct. App. 1948). *See also Quarles v. Smith*, No. W2009-00514-COA-R3-CV, 2010 Tenn. App. LEXIS 136, at *13 (Tenn. Ct. App. Feb. 24, 2010) (quoting other cases wherein it was stated: "[o]ccasional grazing and cultivation are insufficient to establish adverse possession[,]" and "occasional use of land by cutting trees, no matter how long, will not *alone* constitute adverse possession." (citations omitted) (emphasis in original)), *no appl. perm. appeal filed*.

"Actions such as the taking of firewood and hunting are more indicative of an intent to trespass than an intent to seize and hold the land." *Heaton v. Steffen*, No. E2008-01564-COA-R3-CV, 2009 Tenn. App. LEXIS 574, at *15 (Tenn. Ct. App. Aug. 27, 2009), *no appl. perm. appeal filed*.

The evidence in the record on appeal shows that both Plaintiffs' surveyor and Ms. Hammontree's surveyor found evidence that a fence had existed in the Disputed Area. Mr. Lingerfelt found fence posts in the corners of the Disputed Area. Mr. Thurston found evidence of fence wire in the trees on two sides of the Disputed Area. Both Ms. Cowart and Ms. Buff testified that their family had built a fence in the Disputed Area, and had kept ponies. The evidence in the record also shows that both sides agree that the fence no longer exists. The evidence shows that the fence was near, if not on, the northern boundary of the Disputed Area. The evidence also shows that the Disputed Area is a wooded area. Ms. Buff testified that the ponies were kept to the north of the fence line, which she drew on an exhibit entered at trial. Ms. Buff's drawing shows that the property to the north of the fence line she drew is Ms. Cowart's property, not the Disputed Area. The record is devoid of evidence showing the duration of time during which the ponies were kept. Ms. Buff also testified that her father and brother put farm equipment and junk in the Disputed Area, and Ms. Cowart testified that they occasionally cut firewood in the Disputed Area.

None of the uses of the Disputed Area shown by Plaintiffs, however, rise to the level of "exclusive, actual, adverse, continuous, open, and notorious." *Cumulus Broad., Inc.*, 226 at 377. Rather, the uses shown, fencing on the northern boundary of the Disputed Area, keeping ponies on Ms. Cowart's property north of the Disputed Area, cutting firewood, and leaving equipment or junk, are more temporary or occasional uses at most. Furthermore, the record is devoid of evidence showing that any of these uses occurred continuously for the requisite period of twenty years. As such, Plaintiffs failed to show by clear and convincing evidence that they adversely possessed the Disputed Area.

Plaintiffs did not adversely possess the Disputed Area and produced no other evidence which would rebut Ms. Hammontree's presumption of ownership of the Disputed Area pursuant to Tenn. Code Ann. § 28-2-109. We, therefore, reverse that portion of the Trial Court's judgment finding and holding that Plaintiffs hold title to the Disputed Area, and instead find and hold that Ms. Hammontree holds title to the Disputed Area.

We next consider whether the Trial Court erred in dismissing Ms. Hammontree's claim for slander of title. With regard to claims for slander of title, this Court explained in *Brooks v. Lambert*:

Slander or libel of title was first recognized as a cause of action in *Smith v. Gernt*, 2 Tenn. Civ. App. 65, 79-80 (1911). *Harmon v. Shell*, No. 01-A-01-9211-CH-00451, 1994 WL 148663 (Tenn. App. M.S. Apr. 27, 1994). To establish a successful claim for slander of title, a plaintiff must prove:

> (1) that it has an interest in the property, (2) that the defendant published false statements about the title to the property, (3) that the defendant was acting maliciously, and (4) that the false statements proximately caused the plaintiff a pecuniary loss. (citations omitted).

*Id*. at *4. Statements made with reckless disregard of the property owner's rights or with reckless disregard as to whether the statements are false may be malicious within the scope of a libel of title action. *Id.* (citing *Gernt*, 2 Tenn. Civ. App. at 79-80). To assert this cause of action, the plaintiff must allege "malice … in express terms or [by] any such showing of facts as would give rise to a reasonable inference that [the defendant acted maliciously.]" *Waterhouse v. McPheeters*, 176 Tenn. 666, 669, 145 S.W.2d 766, 767 (1940). A good faith, but erroneous, claim of title does not constitute a cause of action for libel of title. *Ezell v. Graves*, 807 S.W.2d 700, 704 (Tenn. App. 1990).

*Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999). As this Court further explained in *Phillips v. Woods*:

Libel[2] of title has been found to occur "when a person . . ., without privilege to do so, willfully records or publishes matter which is untrue and disparaging to another's property rights in land as would lead a reasonable person to foresee that the conduct of a third party purchaser might be determined by the

---

[2] As we explained in *Phillips v. Woods*:

We focus on "libel" of title because the instant case involves a writing. With respect to the basis upon which we decide this case, what we say about libel of title applies with equal force to slander of title. The action is sometimes referred to as one for disparagement of title. *See Albertson v. Raboff*, 46 Cal. 2d 375, 295 P.2d 405, 408 (Cal. 1956). We have previously held that this cause of action, regardless of the label placed upon it, is a species of a claim for "injurious falsehood." *See Wagner v. Fleming*, 139 S.W.3d 295, 302 (Tenn. Ct. App. 2004).

*Phillips v. Woods*, 2008 Tenn. App. LEXIS 193, at *18 n.4.

publication, or maliciously records a document which clouds another's title to real estate." 53 C.J.S. Libel and Slander § 310 (2005) (footnotes omitted) (emphasis added).

*Phillips v. Woods*, No. E2007-00697-COA-R3-CV, 2008 Tenn. App. LEXIS 193, at **18-19 (Tenn. Ct. App. March 31, 2008) (footnote added), *no appl. perm. appeal filed*.

A careful and thorough review of the record on appeal reveals that Ms. Hammontree failed to prove all of the elements of slander of title. Specifically, Ms. Hammontree failed to prove publication or malice. As such, the Trial Court did not err in dismissing Ms. Hammontree's claim for slander of title. We affirm that portion of the Trial Court's judgment dismissing Ms. Hammontree's claim for slander of title.

## Conclusion

The portion of the judgment of the Trial Court holding that Plaintiffs hold title to the Disputed Area is reversed, and judgment is entered holding that Ms. Hammontree holds title to the Disputed Area. The remainder of the Trial Court's judgment is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellees, Patsy R. Cowart, Debbie Buff, and David Buff.

_____
D. MICHAEL SWINEY, JUDGE